**TOWN OF NORWOOD, MASSACHUSETTS, Petitioner,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Northeast Center for Social Issues Studies, Petitioner,**

**v.**

**Federal Energy Regulatory Commission, Respondent.**

Nos. 98–1847, 98–1876, 98–2072, 98–2198, 98–2199.

United States Court of Appeals, First Circuit.

Heard Oct. 5, 1999.

Decided Feb. 2, 2000.

Charles F. Wheatley, Jr. with whom Wheatley & Ranquist, Kenneth M. Barna, Alan K. Posner and Rubin & Rudman were on consolidated brief for petitioner Town of Norwood, Massachusetts.

Richard Roos–Collins, Natural Heritage Institute, for petitioner Northeast Center for Social Issue Studies.

Larry D. Gasteiger with whom Douglas W. Smith, General Counsel, Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor, Federal Energy Regulatory Commission, were on consolidated brief for respondent.

Edward Berlin with whom Robert V. Zener, Swidler Berlin Shereff Friedman, LLP, William J. Madden, John A. Whittaker and Winston & Strawn were on brief for intervenor New England Power Company.

Zori G. Ferkin with whom Earle H. O'Donnell, Andrew B. Young, Donald W. Stever and Dewey Ballantine LLP were on brief for intervenor USGen New England, Inc.

Before BOUDIN, STAHL and LIPEZ, Circuit Judges.

BOUDIN, Circuit Judge.

In this case, the Town of Norwood, Massachusetts ("Norwood") and the Northeast Center for Social Issue Studies ("Northeast Center") seek review of a series of orders of the Federal Energy Regulatory Commission ("FERC") directed *inter alia* to New England Power Company ("New England Power"), which engages in interstate wholesale electric power distribution in New England. In a companion deci-

sion, *Town of Norwood v. New England Power Company*, 202 F.3d 408 (1st Cir. 2000), we decide today a separate appeal by Norwood from the dismissal of an antitrust and breach of contract suit that it brought in the district court against New England Power and others.

## I. *THE HISTORY*

Our history of this case is drawn primarily from the administrative record. For many years New England Power served as one of the major wholesalers of electric power in New England. It operates a high voltage transmission network, and in the past has owned and operated a number of generating plants, including hydroelectric, fossil, and nuclear. New England Power is a subsidiary of New England Electric System, which also owns four "retail" distribution companies, including Massachusetts Electric Company ("Mass Electric") serving Massachusetts, and Narragansett Electric Company ("Narragansett") serving Rhode Island.

New England Power sells wholesale power that it generates or buys from others both to affiliates like Mass Electric and to non-affiliated wholesale customers like Norwood, which operates its own municipal electric system serving businesses and residents in the Town of Norwood, Massachusetts. In general, wholesale sales in interstate commerce are subject to regulation by FERC under the Federal Power Act, 16 U.S.C. §§ 791a–828c, *see* 16 U.S.C. § 824(a), while retail rates (*e.g.,* those charged by Mass Electric to its business and residential customers) are subject to state regulation, *e.g.,* Mass. Gen. Laws ch. 164, §§ 93–94E; *see also Boston Edison Co. v. City of Boston*, 390 Mass. 772, 459 N.E.2d 1231, 1233 (1984).

Traditionally, at both the federal and state level, electricity sales have been regulated on the familiar public utility model: the rates have been set forth in filed tariffs, unreasonable or unduly discriminatory rates have been forbidden, and an administrative agency has been charged with overseeing rates and other related subjects (such as extension of lines, mergers, and the like). *See generally Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 20 (1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991). In many cases, as with New England Power, the suppliers are vertically integrated and are engaged in electricity generation, intercity transmission, and local distribution. *See id.* at 19.

As with other, once fully regulated industries, legislators and regulators have over the last 25 years sought to introduce a greater measure of competition into the electric power industry. In the case of electric power, this has been achieved not by encouraging duplication of intercity transmission or local distribution networks—as is occurring in the telephone industry—but primarily by regulatory changes. These include imposing obligations on facilities' owners to carry power for other suppliers ("wheeling"), encouraging customers to choose among competing suppliers, and discouraging anticompetitive practices by a variety of means, including restructuring so as to reduce the incentives for anticompetitive behavior. *See generally* Energy Information Administration, U.S. Dep't of Energy, *The Changing Structure of the Electric Power Industry: Selected Issues, 1998*, DOE/EIA–0562(98) (1998). Both Massachusetts and Rhode Island have been seeking to foster retail competition in the supply of electricity.

To this end, in December 1996, New England Power filed with FERC proposed amendments to power sales agreements with Mass Electric and Narragansett. Prior to the filing, requirements contracts obligated New England Power to supply its affiliates with all of their needs for electric power; the wholesale rates were specified in tariff schedules and termination by either side required lengthy prior notice (*e.g.* seven years). The proposed amendments permitted the affiliates to terminate on short notice, but subject to

paying as a termination charge a portion of the costs incurred by New England Power in preparing itself to meet their projected longer-term requirements.

FERC referred the new filings to an administrative law judge, *New England Power Co.*, 78 F.E.R.C. ¶ 61,080 (1997), under whose auspices settlement discussions occurred. *See New England Power Co.*, 80 F.E.R.C. ¶ 63,003 (1997). In May 1997, New England Power filed proposed settlement agreements, which again permitted early termination for its affiliates (subject to termination charges), and provided that after termination New England Power would provide Mass Electric and Narragansett (at their option) with new "wholesale standard offer rates" which are described below. The settlement also committed New England Power to file a plan with FERC, by October 1, 1997, to divest itself of most of its generation business. Both of these steps, more fully described below, were purportedly designed to foster competition.

On October 1, 1997, New England Power sought approval from FERC to sell practically all of its non-nuclear electrical generating plants to USGen New England, Inc. ("USGenNE"), a subsidiary of a major west coast public utility holding company ("PG & E"). The sale required FERC approval both for the sale of certain facilities and the transfer of hydroelectric licenses. 16 U.S.C. §§ 801, 824b. In connection with its proposed purchase of assets, USGenNE agreed to assume responsibility for providing wholesale standard offer service to Mass Electric and Narragansett, and New England Power proposed to implement a rate freeze that would prevent increases in rates for its remaining wholesale customers, including Norwood.

Since 1983, Norwood has purchased electricity at wholesale from New England Power and resold it to local businesses and residential customers. Its agreement with New England Power, as extended by Norwood, obligated Norwood to take its requirements from New England Power through October 31, 2008.[1] Regarding the wholesale standard offer rates proposed for New England Power affiliates as an unfair advantage to retail "competitors," Norwood notified New England Power on March 4, 1998, that it was switching to a different wholesale supplier. Norwood has now become a wholesale customer of Northeast Utilities, another major supplier of wholesale electricity in New England.

New England Power countered on March 18, 1998, by filing a proposed tariff revision that would permit its remaining wholesale customers to terminate their long-term requirements contracts on 30 days' notice. But the tariff purported to subject such customers to payment of a contract termination charge to permit New England Power to recover the revenues that it would have collected had the customers continued to pay the fixed tariff rate through the contract term, less the expected costs avoided by not providing service. New England Power subsequently billed Norwood for a portion of this termination charge but Norwood apparently has declined to pay.

---

1. In April 1998, Norwood petitioned FERC for a declaratory order determining that the contract was not in fact extended to October 2008 because, *inter alia*, New England Power did not file with FERC an amendment reflecting the extension. FERC denied the petition, *Town of Norwood*, 87 F.E.R.C. ¶ 61,341 (1999), but now urges us to avoid piecemeal litigation by dismissing or staying this appeal pending possible rehearing of the latest order. But there is little overlap between that order (regarding the expiration date of Norwood's contract) and the instant petitions (primarily concerning the lawfulness of the contract termination charge). And even if on rehearing FERC found in favor of Norwood, the termination charge controversy would remain a live issue, as to the period after Norwood stopped receiving electricity from New England Power (April 1, 1998) but before the requirements contract expired (October 31, 1998, according to Norwood's no-extension theory).

In the proceedings before FERC, Norwood objected to each of the three measures proposed by New England Power: (1) its proposed settlement with its affiliates to terminate their requirements contracts and to provide them the option of wholesale standard offer rate service; (2) its proposed divestiture of generating facilities to USGenNE and the associated freeze on the wholesale rates New England Power charged to its unaffiliated wholesale customers; and (3) its March 1998 tariff amendments allowing unaffiliated wholesale customers like Norwood to terminate their requirements contracts on short notice but only on payment of a contract termination charge.

In a set of orders in these three proceedings issued between November 1997 and June 1998, FERC rejected virtually all of Norwood's requests for relief.[2] Among other things, FERC approved the settlement agreement; it approved the sale of non-nuclear generating facilities to USGenNE and the transfer of hydroelectric licenses to it; and it upheld New England Power's imposition of a contract termination charge on unaffiliated purchasers who sought to terminate their existing contracts prematurely. Norwood sought direct review in this court, 16 U.S.C. § 825l(b), and we have consolidated its appeals into the present case.

Separate petitions for review of the FERC orders were filed in this court by Northeast Center. Its petitions challenged the orders insofar as they approved the sale to USGenNE of New England Power's hydroelectric generating facilities and associated licenses. Northeast Center challenged these actions on the ground that FERC had violated the Federal Power

er Act by failing to consider whether the divestiture would reduce property tax revenues of adjacent communities, and that FERC had violated both that statute and environmental laws by failing to give adequate attention to the potential environmental impact of the transfers. This court consolidated these petitions for review with those of Norwood.

## II. *DISCUSSION*

1. Norwood's main attack, but not its only one, is upon FERC's approval of the contract termination charge that the New England Power tariff amendment of March 18, 1998, imposes on unaffiliated wholesale customers; this charge, as already explained, applies to a requirements contract customer who chooses to end its purchases before the end of the contract term and without the required notice. The amendment provides the customer an option to terminate at short notice but sets a specific tariff-based price on early departure.

FERC is entitled to review tariff amendments governing wholesale power sales under a "just and reasonable" standard, 16 U.S.C. § 824d(a); and at least on the surface the amendment serves the Commission's goal of fostering competition by giving Norwood an option to enter immediately into competitive purchasing. But Norwood argues that FERC's action is unlawful for a number of independent reasons, which we next address.

First, Norwood says that the approval is inconsistent with the Commission's "stranded cost recovery" provisions adopted in FERC Order No. 888 and associated regulations.[3] Order No. 888 im-

---

**2.** *New England Power Co.*, 83 F.E.R.C. ¶ 61,-174 (1998), *reh'g denied*, 84 F.E.R.C. ¶ 61,175 (1998); *New England Power Co.*, 82 F.E.R.C. ¶ 61,179 (1998), *reh'g denied*, 83 F.E.R.C. ¶ 61,275 (1998); *New England Power Co.*, 81 F.E.R.C. ¶ 61,281 (1997), *reh'g denied*, 83 F.E.R.C. ¶ 61,265 (1998).

**3.** Order No. 888, Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed. Reg. 21540 (1996) (rule codified as revised at 18 C.F.R. pts. 35 & 385), *clarified*, 76 F.E.R.C. ¶ 61,009 (1996), 76 F.E.R.C. ¶ 61,347 (1996) and 79 F.E.R.C. 61,182 (1997), *order on reh'g*, Order No. 888–A, 62 Fed.Reg. 12274 (1997), *order on reh'g*, Order No. 888–

posed on investor-owned power companies a general obligation to wheel power for customers, many of whom had previously bought their power from one transmission company—normally, an integrated supplier—but now wished to use that company merely to transport power bought from another company. The order conditioned this wheeling obligation on the customers contributing to the recovery of the so-called "stranded costs" of the transporting company.

Stranded costs were defined in detail by FERC formulas but the general concept was this: in providing "bundled" service (generation and transmission), power companies had made investments expecting to recover them from captive customers. The wheeling obligation imposed by Order No. 888 could permit such customers to reach cheaper power elsewhere; and in some cases this would leave the power companies with investments, especially in generation facilities, that could not be fully recovered in a competitive environment. Stranded cost recovery to protect reasonable *expectations* was FERC's quid pro quo for open access to competing electricity suppliers during this period of transition.

The stranded cost recovery for which the orders and regulations provided was framed as an obligation of those customers who had previously been power customers of the integrated supplier but now chose to use only its transmission system. *See* 18 C.F.R. § 35.26(b)(1), (c)(2) (1999). Norwood's first objection to the contract termination charge in this case is that although Norwood previously bought *power* from New England Power, it got its *transmission* service for such power from Boston Edison and does not intend to use New England Power transmission service in the future. Thus, says Norwood, it falls outside the scope of FERC's stranded cost

regulation and the tariff is inconsistent with Order No. 888.

FERC concedes that its Order No. 888 regulations do not apply in this case. But, as FERC notes, there is a separate (although parallel) justification for stranded cost recovery in the present case: Norwood as a requirements-contract customer of power furnished by New England Power is being afforded an option to switch immediately to a competing supplier, without the seven years' notice required by the contract. *New England Power Co.*, 83 F.E.R.C. ¶ 61,174, at 61,722–23 (1998). In short, there is a different reason for similar relief; and while Order No. 888 does not mandate the new tariff, neither does it forbid it. *See* Order No. 888, 61 Fed.Reg. at 21662 (reserving the possibility of stranded cost recovery in other situations).

Norwood also argues that Order No. 888 and FERC's regulations excluded from stranded cost recovery those cases where a requirements contract was entered into or extended after July 11, 1994. FERC's stated reason for this limitation was that on that date it first gave public notice of its stranded cost proposal; thereafter, for new contracts the supplier and purchaser could make their own arrangements for early termination, recovery, and the like. Order No. 888, 61 Fed.Reg. at 21641; *see also* 18 C.F.R. § 35.26(b)(7), (c)(1)(ii). Norwood says that while its original contract was made prior to July 11, 1994, New England Power and Norwood agreed to changes in the agreement after that date. But the restrictions in Order No. 888 are no more than conditions on stranded cost recovery *under that order* and do not preclude the Commission from allowing tariffs that permit somewhat similar recovery whenever a customer purports to disregard an existing contractual obligation.

■ Second, Norwood claims that the tariffed termination charge is nothing more than an effort to collect contract

B, 81 F.E.R.C. ¶ 61,248 (1997), *order on reh'g*, Order No. 888–C, 82 F.E.R.C. ¶ 61,046 (1998), *petitions for review pending sub nom.*

*Transmission Access Policy Study Group v. FERC*, Nos. 97–1715, *et al.* (D.C.Cir. Mar. 30, 1998).

damages for early termination through the Commission's processes, and that this conflicts with FERC's practice of deferring to the courts on matters of contract and deprives Norwood of the chance to counter a contract breach claim by showing that New England Power breached the contract first. Admittedly, the stranded cost recovery in the tariff is closely akin to contract damages, and the Commission in the past has declined to adjudicate some contract disputes. *E.g., Southern Cal. Edison Co.,* 85 F.E.R.C. ¶ 61,023 (1998).

But FERC's abstention in cases like *Southern California Edison* appears primarily to reflect an unwillingness to resolve disputes about the *meaning* of disputed contract provisions. Here, the Commission has not interpreted Norwood's contract with New England Power or determined whether Norwood has breached the contract or has been freed from the contract based on a breach by New England Power. *See New England Power Co.,* 84 F.E.R.C. ¶ 61,175, at 61,920 (1998). It has merely upheld, on a generic basis, a termination charge for those customers who are bound by existing contracts but wish to avoid their obligations.

■ Third, Norwood claims that FERC had to reject the New England Power tariff offering customers the termination option because it conflicts with the *Mobile-Sierra* doctrine and the filed rate doctrine. The former, developed in cases interpreting the Federal Power Act and the Natural Gas Act, *Federal Power Comm'n v. Sierra Pac. Power Co.,* 350 U.S. 348, 354–55, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 344, 76 S.Ct. 373, 100 L.Ed. 373 (1956), prevents FERC from overriding a contract unless it finds that the contract is contrary to the public interest. *See Texaco, Inc. v. FERC,* 148 F.3d 1091, 1095–97 (D.C.Cir. 1998). The doctrine protects a party's interest in its contract (unless overridden by a public interest finding).

In a sense, the addition of the express option to terminate earlier (at a specified price) can be viewed as modifying the contract. But from Norwood's vantage, the option merely gives it something that it did not have before; it remained free to insist that New England Power continue to supply power under the contract until expiration. The termination charge is certainly a detriment but, absent a showing that its formula is any worse than contract damages, it merely spells out what would have been the law's remedy if Norwood had no option but simply breached the existing contract.

■ The filed rate doctrine can—so far as relevant here—be regarded as a prohibition on retroactive increases for tariffed services. *See Arkansas La. Gas Co. v. Hall,* 453 U.S. 571, 577–78, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). Formally, the filed rate doctrine says that the only lawful rate is that reflected in the tariff on file when the service is performed, *id.,* but the refusal to permit retroactive increases is taken as a corollary, *id.* at 578, 101 S.Ct. 2925.[4] Most regulatory statutes, but not all, *see Federal Power Comm'n v. Sunray DX Oil Co.,* 391 U.S. 9, 24, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968), permit reparations to the customer if the tariff rate is later shown to be unreasonably high, but the carrier can never collect more than the tariffed rate.

■ Norwood is not being asked to pay more for past purchases than provided for by the tariff in effect at the time of such purchases. The tariff change, as just not-

---

4. Although the doctrine originated as a bar to shipper efforts to pay something less than the tariff rate, *see, e.g., Texas & Pac. Ry. Co. v. Mugg & Dryden,* 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011 (1906), it has evolved, *see, e.g., Keogh v. Chicago & N.W. Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), into a much broader limitation on civil lawsuits that have the effect of contradicting or undercutting a tariffed rate regulated by a federal agency, *see, e.g., Arkansas La. Gas,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856. This latter development is considered in our companion decision.

ed, gives Norwood an option it did not have before to cancel *future* purchases on short notice by paying a termination charge—hardly a retroactive increase in charges for past purchases. Norwood says that the change is retroactive because it was imposed after Norwood had ceased to make purchases under FERC Tariff No. 1, Norwood having disclaimed its existing contract and signed on with a new supplier. But the change only governed Norwood as to its future purchases—or failures to purchase—from New England Power; there was no effort to increase rates for purchases made in the past, which is the pertinent concern of the filed rate doctrine.

■ Fourth, Norwood says that New England Power has failed to supply data to show that it is "just and reasonable" to require Norwood to pay a contract termination charge allegedly amounting to $78 million for the period from 1998 through 2008. Norwood derives this figure by projecting the termination charges from April 1, 1998, through the expiration of the extended contract which Norwood has now disavowed. The Federal Power Act requires just and reasonable rates, 16 U.S.C. § 824d(a), and the regulations for rate filings generally require the filing of cost of service data for new or increased rates, 18 C.F.R. §§ 35.12, 35.13.

But the termination charge is not a new or increased rate for supplying energy. It is a formula-driven charge to cover certain projected losses to New England Power caused by *not* supplying electricity after preparing to do so, calculated based on rates already approved by FERC. Thus the contract termination charge in no way represents a rate increase for Norwood.[5] If these charges were miscomputed or unsupported, Norwood might well have a le-

gitimate objection; but it has not explained any such objection to us, let alone tried to support it with citations or figures.

Before FERC, Norwood primarily urged that the contract termination charge filing be rejected in its entirety. But in a footnote in its motion to intervene, and more fully in its motion for rehearing, Norwood also sought a hearing regarding the reasonableness of the amount that New England Power sought to recover—referring, *inter alia,* to alleged problems with the contract termination charge calculation. FERC denied the request for rehearing, concluding that no evidentiary hearing was necessary because no party had raised a disputed issue of material fact. *New England Power Co.,* 84 F.E.R.C. ¶ 61,175, at 61,920 (1998).

To whatever extent there was in fact a disputed issue regarding the termination charge calculation that necessitated a hearing, *cf. Louisiana Energy & Power Auth. v. FERC,* 141 F.3d 364, 371 (D.C.Cir.1998), Norwood does not identify it to us. FERC suggested in its initial order that Norwood could file a section 206 complaint, 16 U.S.C. § 824e, challenging the substance of the contract termination charge, *New England Power Co.,* 83 F.E.R.C. ¶ 61,174, at 61,724 (1998), and presumably it can still do so, *cf. OXY USA, Inc. v. FERC,* 64 F.3d 679, 690 (D.C.Cir.1995).

■ Fifth, Norwood's final set of objections to the termination charge are of a different character. In substance, Norwood complains that the termination charge imposed on it exceeds the charge imposed on affiliates of New England Power; that the so-called wholesale standard offer rate (available to the affiliates but not to Norwood) is unfairly low during the

---

5. New England Power filed its proposed tariff amendment under FERC's abbreviated filing provision, 18 C.F.R. § 35.13, which exempts certain rate schedule changes from typical cost-of-service filing requirements. In particular, 18 C.F.R. § 35.13(a)(2)(iii) provides for abbreviated filing for "a rate schedule change

that does not provide for a rate increase" in certain circumstances. FERC held that the filing was proper "because payment of the CTC will not result in a rate increase over the existing Tariff No. 1 rates." *New England Power Co.,* 84 F.E.R.C. ¶ 61,175, at 61,920 (1998).

opening years and dangerously high thereafter; and that these discrepancies, and the threatened effects, require rejection of both the termination charge and the standard offer rates—or at least evidentiary hearings.

The Commission's answer regarding the contract termination charge—that the affiliates "settled" with New England Power, *New England Power Co.*, 83 F.E.R.C. ¶ 61,174, at 61,723 n. 13 (1998), *reh'g denied*, 84 F.E.R.C. ¶ 61,175, at 61,920 (1998)—would make the hairs stand up on the neck of an old-fashioned utility lawyer. The utility tradition, growing out of hostility to preferences and rebates, has been to oppose unequal treatment or at least to treat it with great skepticism. Specifically, the Federal Power Act outlaws unjustifiably disparate treatment of similarly situated entities under the rubric of "undue preference." 16 U.S.C. § 824d(b).

■ But differential treatment does not necessarily amount to *undue* preference where the difference in treatment can be explained by some factor deemed acceptable by the regulators (and the courts). *E.g., Cities of Newark v. FERC*, 763 F.2d 533, 546 (3d Cir.1985). The District of Columbia Circuit, which reviews more such regulatory matters than any other court, has approved divergent treatment that stems from a settlement, reasoning that there is a public interest in settlements and that one party should not be able to frustrate a settlement for everyone else. *Cities of Bethany v. FERC*, 727 F.2d 1131, 1138–40 (D.C.Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984); *United Mun. Distribs. Group v. FERC*, 732 F.2d 202, 212–13 (D.C.Cir.1984).

Norwood attacks this justification for differential treatment on the ground that it should not apply where the non-settling parties were denied an opportunity to attack the settlement in the administrative proceeding. However, even assuming that such a limitation exists (and perhaps it should), the Administrative Law Judge found that Norwood's request for a hearing on the settlement was out of time and unsupported, *New England Power Co.*, 80 F.E.R.C. ¶ 63,003, at 65,040–41 (1997), and Norwood offers no answer to this ruling.

Under these circumstances, we think that the mere disparity in Norwood's contract termination charge vis à vis that of other companies that settled is not a *per se* violation of the "undue preference" prohibition. Norwood passed up the opportunity to settle with New England Power regarding termination, *see New England Power Co.*, 83 F.E.R.C. 61,174, at 61,723 n. 13 (1998), and argued to FERC that the contract termination charge approved in the settlement proceeding was too high. It seems to us that at least where a party has been offered the same settlement and refused it, a claim based simply on an abstract right to be treated the same as settling companies has much less force—and to recognize it would subvert the public interest in promoting settlements.[6] Whether an undue preference claim might be made based on competitive or other market impacts is a different issue, addressed below.

■ 2. Norwood's more interesting claim of undue preference is directed not to the contract termination option and charge—Norwood's main target—but to the wholesale standard offer rates, which appears to have been offered only to affiliates of New England Power. These rates were not offered to Norwood; and al-

---

**6.** As it happens, New England Power does trouble in its brief to explain why it computed a different contract termination charge for Norwood. It says that in the settlement (the termination provisions of which it offered to Norwood) the formula was based on a theory that—unlike the charge in the latter tariff—involved projecting and allocating an overall loss to New England Power from the transition (with offsetting credits for benefits). Since the projection was based on disputable estimates, the company based its tariff on the more readily calculable figures relating to estimated purchases under the contract less estimated avoided costs.

though they were initially included in the FERC settlement, they do not appear to be a resolution of any existing legal obligation between New England Power and its affiliates. Their origin and justification are quite different.

The wholesale standard offer rates, it appears, are a schedule of wholesale power rates that begins at a rather low level and then climbs over a number of years to a rather high level.[7] It interlocks with schedules of *retail* standard offer rates that New England Power's affiliates have agreed, in settlements with their respective state commissions, to offer as a safeguard for retail customers who do not or cannot immediately take advantage of the competitive sources of retail supply that both federal and state regulators foresee developing. *See New England Power Co.,* 82 F.E.R.C. ¶ 61,179, at 61,664 (1998); *In re Massachusetts Elec. Co.,* Mass. D.P.U. 96–25, at 23–25 (Feb. 26, 1997). To the extent that customers take advantage of these initially favorable retail rates from the affiliates, the retailers themselves will have counterpart wholesale rates.

These "backup" standard offer rates are not intended as a permanent low-cost option. On the contrary, they increase sharply over a brief period partly in order to encourage customers to migrate into the competitive market once they have had time to negotiate with retailers who, because of wheeling obligations imposed at both the wholesale and retail level, will then be able to compete to supply once-

captive customers. *See In re Massachusetts Elec. Co.,* Mass. D.P.U., at 23–25. But Norwood, being a municipal system, is not subject to these wheeling obligations and has no obligation to offer retail standard offer rates as a backup for its retail customers. *See* Mass. Gen. Laws ch. 164, § 47A.

Norwood says that the wholesale standard offer rates were denied to it and are below the market rate; it argues that FERC therefore should have held hearings to determine whether the rates were unduly discriminatory.[8] FERC explained the special rates by pointing to the New England Power affiliates' obligation to offer retail standard offer rates to their own customers and their consequent need for dovetailed wholesale standard offer rates from their supplier. *New England Power Co.,* 82 F.E.R.C. ¶ 61,179, at 61,664. Norwood was not similarly situated because it had no similar obligation. On the surface, this is a plausible explanation for differential treatment, at least in the absence of some plausible rejoinder from Norwood.

Norwood also complains that the wholesale standard offer rates were not justified by cost-of-service data. New England Power did not submit any because it contended that the initial standard offer rates did not amount to a rate increase and cost-of-service data was therefore not required by FERC regulations. 18 C.F.R. § 35.13(a)(iii). When USGenNE proposed to take over the standard offer service from New England Power, it did so as part

---

7. For example, the rate goes from 3.2 cents per kilowatt hour to 5.1 cents per kilowatt hour between 1998 and 2004. Norwood claims that the early-year prices are below-market, but whether that is so is unclear from the record.

8. Norwood did not clearly raise this issue before FERC when the standard offer rate was initially filed. In the settlement proceeding in which the standard offer rate was first accepted by FERC, Norwood primarily argued that the standard offer rates were too *high*—it worried that the prices would eventually apply to it as well. In its motion for rehearing, Norwood added the argument that

the standard offer rates were below the then-applicable Tariff No. 1 rates. But by the time FERC decided the motion, Norwood had apparently repudiated its Tariff No. 1 contract with New England Power; FERC therefore determined that Norwood could no longer claim to be harmed by the rate differential. *New England Power Co.,* 83 F.E.R.C. ¶ 61,265, at 62,106 (1998). FERC did discuss the standard offer rates in the context of the divestiture proceeding, where the rate agreements were assumed by USGenNE. *See, e.g., New England Power Co.,* 82 F.E.R.C. ¶ 61,179, at 61,664.

of its application for "market-based rate" approval: FERC approved the petition in relevant part, concluding that USGenNE need not be limited to cost-of-service rates because it did not have market power in generation or transmission. *New England Power Co.*, 82 F.E.R.C. ¶ 61,179, at 61,662, 61,665. *See generally Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 365 (D.C.Cir.1998). Norwood offers no response to these arguments.

3. This brings us to Norwood's final set of arguments, alleging that the FERC actions it attacks will have a series of anti-competitive *effects*. One action is the relatively high contract termination charge imposed on Norwood; the second is the provision to Mass Electric of the favorable wholesale standard offer rates. Taken together, says Norwood, these steps will have a variety of anticompetitive consequences and, at the very least, FERC should have conducted an evidentiary inquiry into this claim.

■ Conceivably, a difference in treatment otherwise justified might be less so if it had an anticompetitive impact, *see Cities of Bethany v. FERC*, 727 F.2d 1131, 1141 (D.C.Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984), and the agency might be faulted if it declined even to inquire into a well-supported claim of this kind, *cf. Michigan Pub. Power Agency v. FERC*, 963 F.2d 1574, 1578–79 (D.C.Cir. 1992). In the agency and in this court, Norwood has alleged anticompetitive effects. But mere allegations of impact do not trigger an evidentiary hearing. To justify a hearing, the allegations must raise a genuine issue of material fact that cannot be adequately resolved on the written record. *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 371 (D.C.Cir.1998).[9]

Here, Norwood appears to allege three different effects: that the initial wholesale standard offer rates are so low that they will discourage the development of *wholesale* competition in New England that might otherwise provide lower prices for Norwood, enabling it better to serve its customers and to compete with New England Power affiliates; that the denial of standard offer rates to Norwood in these early years, coupled with a high contract termination charge, will force Norwood's costs to a level well above those of New England Power's affiliates, again impairing Norwood's ability to compete with those affiliates; and that higher standard offer rates in later years will force up the general level of wholesale prices in New England, harming consumers and Norwood at the same time.

These assertions appear, with more or less detail, in the affidavits of two experts that Norwood submitted to FERC. They were countered in some measure by other expert testimony. While some of the assertions in Norwood's affidavits are doubtful at best, the Commission's orders offer only a relatively sketchy discussion of competitive impact. In sum, if Norwood had seriously briefed the issue, we *might* have a serious issue to decide.

Instead, Norwood's main brief offers us only a couple of conclusory statements coupled with references to its affidavits. Norwood makes little effort to explain the basis for its predictions, does not match them up with what the Commission said in its orders, and does not address obvious critical issues: *e.g.*, the actual extent of competition between Norwood and New England Power's affiliates, each of whom primarily serves separate retail areas; why new wholesale competition will not

---

9. 18 C.F.R. § 2.17 provides special procedures for triggering a hearing where a wholesale customer makes a prima facie showing that price discrimination results in a "price squeeze" (in short, a combination of high wholesale prices and low retail prices that makes it impossible for a wholesale customer to compete with its supplier at the retail level). *See Cities of Bethany*, 727 F.2d at 1140–41 & n. 41. Although Norwood sometimes refers to the contested prices as a price squeeze, it does not here purport to have made the specific showing necessary to trigger 18 C.F.R. § 2.17.

develop as the wholesale standard offer rates rise; and why imports of electricity will not constrain USGenNE.

Since Norwood has virtually abdicated its responsibility to brief the issue to us, FERC's own brief only touches on the competition issues; the New England Power brief, although more helpful, offers only brief comments on a few points. Thus, we have no coherent and developed argument in this court to address on the competition issue. In these circumstances, Norwood has forfeited its argument; developing a sustained argument out of economic materials and legal precedents is the job of the appellant, not the reviewing court, as we have previously warned. *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 595–97 (1st Cir.1993); *see also Gamma Audio & Video, Inc. v. Ean–Chea*, 11 F.3d 1106, 1113 (1st Cir.1993).

Indeed, in an area this complicated, it is doubtful that we could do an adequate job on our own, although we might still try if a severe threat to the public interest appeared likely from the affidavits. But a negative long-term effect on power rates in New England is among the less plausible of the conjectures; and the short-term competitive impact on Norwood is something that it should have been able to explain and support in an appellate brief (if the materials were in the record) and it has not done so. Payment of a large termination charge, due in some measure to Norwood's own maneuvers, is not the same thing as demonstrated harm to competition.

4. Northeast Center describes itself as a non-profit corporation dedicated to "public education regarding environmental changes related to technology and energy uses." While Norwood is primarily concerned with rates and termination charges,

Northeast Center's focus is on the transfer of generating facilities from New England Power to USGenNE and the related transfer of hydroelectric licenses.

Both of these steps required the Commission's approval under a broad "public interest" standard. 16 U.S.C. §§ 801, 824b(a); 18 C.F.R. § 9.3.[10] Northeast Center intervened in the administrative proceedings and asked the Commission to hold evidentiary hearings on two alleged possible effects of the transfers: harm to the environment and reduced property tax revenues for towns that collected property taxes on the facilities. The Commission declined to do so or to prepare an environmental impact statement or assessment. *New England Power Co.*, 82 F.E.R.C. ¶ 62,138, at 64,214–15 (1998), *reh'g denied*, 83 F.E.R.C. ¶ 61,272, at 62,132–34 (1998); *New England Power Co.*, 82 F.E.R.C. ¶ 61,179, at 61,661 (1998), *reh'g denied*, 83 F.E.R.C. ¶ 61,275, at 62,148–49 (1998).

 In this court, Northeast Center says that these failures were error. FERC counters that Northeast Center lacks Article III standing to pursue these issues in court. Article III standing is a threshold issue, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 88–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The burden to show standing is upon the litigant whose standing is challenged, *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 104 (1st Cir.1995), and is not established merely because the *agency* permitted intervention, *City of Orrville v. FERC*, 147 F.3d 979, 985 (D.C.Cir.1998).

 The pertinent ground rules for association standing are clear enough in the abstract: to pursue judicial review, an association or similar representative organization may have standing if at least one of its members has standing in his or her

---

**10.** FERC's order approving the divestiture did not purport to approve the sale of the hydropower projects as a whole, but only those facilities within FERC's jurisdiction by virtue of their use for transmission of electric energy in interstate commerce and/or for sale of elec- tric energy at wholesale in interstate commerce. *See* 16 U.S.C. § 824(b)(1). Jurisdictional facilities mentioned by New England Power in its application included generating leads and step-up transformers.

own right, the interests served by the suit are pertinent to the mission of the organization, and relief does not require the presence of the members in the suit. *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir.1992). An individual has standing if he can show that he is suffering or is threatened with injury in fact to a cognizable interest; that the injury is causally connected to the conduct complained of; and that the court is competent to afford relief that will or is likely to redress the injury. *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

We start with the claim of environmental injury. Northeast Center says that it is concerned with the environment, and its member directors live in Vermont and New Hampshire and use the Connecticut River and its tributaries for recreation. The hydroelectric facilities being transferred are located in these states on the Connecticut River. And, it is alleged, the transfer from one licensee and owner (New England Power) to the other (USGenNE) could affect the management of the dams, primarily with regard to water releases and timing, in ways that affect recreational uses, erosion, flooding and water quality.

■ Thus, the issue of standing and "the merits" substantially overlap. FERC's public interest standard encompasses environmental concerns, *see Wisconsin v. FERC*, 104 F.3d 462, 470 (D.C.Cir.1997), and arguably a substantial threat from the transfer would require attention, *cf. Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 876 F.2d 109 (D.C.Cir.1989); *Southern Cal. Edison Co.*, 49 F.E.R.C. ¶ 61,091 (1989). But if there is no credible threat, then the Northeast Center and its members lack standing, *Adams v. Watson*,

10 F.3d 915, 922–23 (1st Cir.1993), and, even if they had standing, FERC's refusal to pursue a speculative claim would not be error. *Northeast Utils. Serv. Co. v. FERC*, 993 F.2d 937, 958–59 (1st Cir.1993).

From either standpoint, the present case is not a close one. FERC was understandably skeptical of the environmental claim; building and operating a major new dam is likely to have environmental consequences, but the transfer of existing facilities from one large utility to another is simply a change in ownership, and USGenNE became subject to the same license conditions and regulations that had bound New England Power. If there is anything in the history of USGenNE or its west coast parent that suggests that either would mismanage the facilities or disobey the conditions or regulations, Northeast Center has not mentioned it.

About all that Northeast Center has done is to refer in passing to a report by a joint state commission, which states that New England Power has done a superior job in managing river flows. But there is nothing to show or even suggest that USGenNE is likely to do a worse job in operating the same facilities or that any predictable variations in its performance are likely to have a significant effect on the environment. And this report, which is not directed specifically at USGenNE and, moreover, which Northeast Center hardly refers to in its briefs, is *all* that Northeast Center offers to support its claim of standing or its demand for a full-scale evidentiary investigation by FERC.

Even the more generous of the cases that uphold standing or require an environmental impact statement or assessment under the National Environmental Policy Act ("NEPA")[11] involved projects more likely to threaten harm or a more particu-

---

**11.** The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare a detailed environmental impact statement regarding any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Implementing regulations direct an agency to prepare a less detailed environmental assessment when the agency is uncertain whether an environmental impact statement is required for a given action. 40 C.F.R. § 1501.4 (1998).

larized showing that harm is threatened. *Cf. United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 683–90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). FERC's own regulations, made in conformity with the governing regulations under NEPA,[12] categorically classify such transfers of ownership and licensing as the kind of projects not likely to have a significant environmental impact or to require a NEPA environmental impact statement or smaller scale assessment. 18 C.F.R. § 380.4(a)(8), (16). If there was reason here for a different outcome, Northeast Center has not provided it.

■ A FERC action that otherwise falls within a categorical exclusion to the NEPA requirements may nonetheless warrant an environmental assessment or environmental impact statement if the action may affect, *inter alia*, wetlands, anadromous fish species, or a National Refuge, 18 C.F.R. § 380.4(b), all of which Northeast Center says are affected by the projects at issue. But the regulation only *requires* an assessment or impact statement if "circumstances indicate that an action may be a major Federal action significantly affecting the quality of the human environment." *Id.* As discussed above, Northeast Center has not presented any evidence indicating how the *license and asset transfers* (as opposed to the projects themselves) will have any impact on the environment.

■ Turning to economic impact, the nature of Northeast Center's claim is quite different. It asserts that competition in the supply of electric power is likely in some cases to impair the value of the existing utility plant, and it points to a Moody's investment survey to support that view. The actions taken in this case by the Commission are designed to foster competition. Ergo, says Northeast Center, the value of the transferred generating facilities may be reduced and the property taxes paid to local communities may decline. This, it says, should have been investigated.

It is sufficient to dispose of this case that Northeast Center has not shown that its own interests would be affected by such a decline in property taxes; and, even assuming that its members or directors might be so affected (based on residence), Northeast Center has not shown that its representational function extends to such private economic concerns. Germaneness of the interests served by a lawsuit to the purpose of the organization is a settled requirement for standing based on membership, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), "preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Humane Soc'y of the United States v. Hodel*, 840 F.2d 45, 57 (D.C.Cir.1988); *see also UAW v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986).

Accordingly, we need not reach the question whether a showing of likely economic impact, made by a person with standing, would compel FERC to pursue the matter, but we are entitled to express our doubts. It is true that the public interest concept is a broad one, but there are limits. Here, FERC has approved a set of transactions based on their effects in the electric power industry, its main responsibility and concern. It is far from clear that a policy aimed at securing lower-cost power for consumers through more

---

12. NEPA regulations direct agencies to identify categories of actions that normally do not require either environmental impact statements or environmental assessments because the agency has found that, as a class, they "do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. FERC's categorical exclusions include, in relevant part, transfers of water power project licenses and approval of actions under section 203 of the Federal Power Act relating to acquisition or disposition of property. 18 C.F.R. § 380.4(a)(8), (16).

competition would or should be curtailed even if it were shown to have some effect on plant value and local taxes in a few communities. *Cf. Northeast Utils. Serv. Co. v. FERC,* 993 F.2d 937, 951 (1st Cir. 1993).

It is worth adding that, to the extent such effects may be predicted from competition, the effects are primarily due to actions already taken by FERC in broader proceedings such as the one that led to Order No. 888. And while competition may well reduce the economic value of some existing plants, this case may be an exception: ironically, Northeast Center's exhibit suggests that the transferred facilities sold for more than their book value.

The petitions for review are *denied.*