**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 24, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TRI-STATE GENERATION AND
TRANSMISSION ASSOCIATION,
INC.,

      Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

      Respondent,

--------------------------------------

BASIN ELECTRIC POWER
COOPERATIVE; MOUNTAIN
PARKS ELECTRIC, INC.; UNITED
POWER, INC.; LA PLATA
ELECTRIC ASSOCIATION, INC.;
NORTHWEST RURAL PUBLIC
POWER DISTRICT,

      Intervenors.

_____

TRI-STATE GENERATION AND
TRANSMISSION ASSOCIATION,
INC.,

      Petitioner,

v.

No. 24-9516

No. 24-9538

FEDERAL ENERGY REGULATORY
COMMISSION,

      Respondent.

----------------------------

UNITED POWER, INC.; LA PLATA
ELECTRIC ASSOCIATION, INC.;
BASIN ELECTRIC POWER
COOPERATIVE; MOUNTAIN
PARKS ELECTRIC, INC.,

      Intervenors.

_____

TRI-STATE GENERATION AND
TRANSMISSION ASSOCIATION,
INC.,

      Petitioner,

and

SAN MIGUEL POWER
ASSOCIATION, INC.; BASIN
ELECTRIC POWER COOPERATIVE,

      Intervenors - Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

      Respondent,

and

UNITED POWER, INC.; LA PLATA
ELECTRIC ASSOCIATION, INC.;

No. 25-9522

2

MOUNTAIN PARKS ELECTRIC,
INC.; NORTHWEST RURAL PUBLIC
POWER DISTRICT,

      Intervenors - Respondents.

_____

TRI-STATE GENERATION AND
TRANSMISSION ASSOCIATION,
INC.,

      Petitioner,

v.                                                                              No. 25-9544

FEDERAL ENERGY REGULATORY
COMMISSION,

      Respondent.

----------------------------------

UNITED POWER, INC.; MOUNTAIN
PARKS ELECTRIC, INC.;
NORTHWEST RURAL PUBLIC
POWER DISTRICT,

      Intervenors.

_____

**Petitions for Review of Orders
from the Federal Energy Regulatory Commission
(FERC Nos. ER21-2818, ER21-2818-002, ER21-2818-004, ER21-2818-005,
ER21-2818-006, ER21-2818-007)**

_____

Misha Tseytlin of Troutman Pepper Hamilton Sanders LLP, Chicago, IL
(Fredrick Wilson and Russell Kooistra of Troutman Pepper Hamilton Sanders
LLP, Washington, DC, Jeff P. Johnson of Troutman Pepper Hamilton Sanders

LLP, Richmond, VA, and Kenneth F. Rossman IV of Lewis Roca Rothgerber Christie LLP, Denver, CO, with him on the briefs), for Petitioner.

Carol J. Banta, Deputy Solicitor (David L. Morenoff, Acting General Counsel, and Robert H. Solomon, Solicitor, with her on the briefs), of Federal Energy Regulatory Commission, Washington, DC, for Respondent.

Jesse Halpern (Anthony F. Blum, Rebecca L. Shelton, Nicole S. Allen, Clifford Godiner, Peter K. Matt, and Jenna C. Cliatt with her on the briefs), of Thompson Coburn LLP, Washington, DC, for Intervenor Basin Electric Power Cooperative.

Norman C. Bay of Willkie Farr & Gallagher LLP, Washington, DC (Matthew S. Larson, Phillip J. Roselli, and Samuel D. Eisenberg of Wilkinson Barker Knauer, LLP, Denver, CO, Lauren M. Perkins, Michael Poster, and Gelane L. Diamond of Duncan, Weinberg, Genzer & Pembroke, P.C., Sacramento, CA, and Richard M. Lorenzo, Nicole A. Travers, and J.D. Taliaferro, of Loeb & Loeb LLP, Washington, DC, with him on the briefs), for Intervenors United Power, Inc., La Plata Electric Association, Inc., Mountain Parks Electric, Inc., and Northwest Rural Public Power District.

_____

Before **PHILLIPS**, **McHUGH**, and **FEDERICO**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

In the early 1930s, few rural communities had access to electricity. Congress, though, thought spreading electric power to rural America would further the national interest. So Congress stepped in and passed the Rural Electrification Act of 1936.

That Act created the Rural Electrification Administration and allowed it to make favorable loans to not-for-profit electricity-distribution cooperatives. Those cooperatives, often organized and owned by their consumer members, used the loans to build and operate electricity-distribution systems.

4

Many of these distribution cooperatives later joined together to form generation-and-transmission cooperatives. This allowed the distribution cooperatives to more readily and economically secure long-term power sources.

Tri-State Generation and Transmission Association, Inc., is one such generation-and-transmission cooperative. Its distribution-cooperative members joined Tri-State by entering long-term, all-requirements contracts. These contracts last through 2050 and require members to buy almost all their electric services from Tri-State.

But what happens when some distribution-cooperative members want to exit Tri-State and end their contracts early? That's the key issue here. Intervenors United Power, Inc., Mountain Parks Electric, Inc., La Plata Electric Association, Inc., and Northwest Rural Public Power District sought early termination of their Tri-State memberships and their all-requirements contracts. In response, Tri-State filed a proposed methodology with the Federal Energy Regulatory Commission for calculating an exit fee.

FERC initiated hearing procedures to identify a just and reasonable exit-fee methodology. Relevant here, both Tri-State and FERC Trial Staff presented exit-fee methodologies to an administrative law judge. Tri-State proposed a lost-revenues approach, and Trial Staff proposed a balance-sheet approach.

The ALJ concluded that Tri-State's proposed exit-fee methodology was not just and reasonable. But she concluded that Trial Staff's proposal was. Unhappy with that conclusion, Tri-State sought FERC's review.

5

FERC agreed with the ALJ that Tri-State's proposed exit-fee methodology was not just and reasonable. FERC then decided that the methodology approved by the ALJ—with some modifications—*was* just and reasonable. So FERC directed Tri-State to adopt it.

In these petitions for review, Tri-State challenges FERC's adopted exit-fee methodology.[1] Simply put, Tri-State thinks the methodology shifts costs to its remaining members and gives departing members a windfall. So it argues that FERC's decisions adopting the methodology were arbitrary and capricious.

Exercising jurisdiction under 16 U.S.C. § 825*l*(b), we deny the petitions for review.

## BACKGROUND

### I.    Statutory Background

The Federal Power Act requires that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy . . . be just and reasonable." 16 U.S.C. § 824d(a). Likewise, "all rules and regulations affecting or pertaining to such rates or charges" also must be "just and reasonable." *Id.* If rates, charges, or related rules and regulations aren't just and reasonable, then they are unlawful. *Id.*

---

[1] The clerk's office procedurally consolidated Case Nos. 24-9516 and 24-9538. It also procedurally consolidated Case Nos. 25-9522 and 25-9544. This opinion addresses all four petitions for review.

Under § 824d, or section 205 of the Act, utilities must file with FERC "tariffs outlining [the utilities'] rates for FERC's approval." *Emera Me. v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017) (citation omitted). This section allows utilities to propose changes to their own rates. *Id.* at 24.

Under § 824e, or section 206 of the Act, FERC has both the "authority" and "duty" to ensure that wholesale electricity rates, charges, and related rules and practices are just and reasonable. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016). If FERC finds otherwise, then it must "determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract" and "fix the same by order." 16 U.S.C. § 824e(a).

Section 205 and section 206 proceedings are "related but distinct." *See Emera Me.*, 854 F.3d at 24 (citation omitted). Section 205 proceedings begin when a utility files its proposed tariff with FERC. *See id.* at 21, 24. The utility need not show that its prior rate was unlawful. *Id.* at 21. But it must convince FERC that its proposed changes are just and reasonable. *See id.* at 24.

By contrast, FERC or a complainant initiates section 206 proceedings, which carry a different burden of proof. *See id.*; 16 U.S.C. § 824e(a). Section 206 imposes a "dual burden" on FERC. *Emera Me.*, 854 F.3d at 25 (citation omitted). First, before FERC can set a new rate, it must prove that the existing one is unlawful. *Id.* at 24–25. Second, it "must show that its proposed changes are just and reasonable." *PPL Wallingford Energy LLC v. FERC,* 419 F.3d 1194, 1199 (D.C. Cir. 2005) (citation omitted).

The Act's just-and-reasonable standard applies to the exit-fee methodology at issue here. *See United Power, Inc. v. FERC*, 49 F.4th 554, 561–62 (D.C. Cir. 2022). Both FERC and federal courts have long understood the Act's just-and-reasonable requirement "to incorporate a cost-causation principle—the rates charged for electricity should reflect the costs of providing it." *Consol. Edison Co. of N.Y. v. FERC*, 45 F.4th 265, 271 (D.C. Cir. 2022) (citation modified). Or put differently, rates must "reflect to some degree the costs actually caused by the customer who must pay them." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (citation omitted); *see also Consol. Edison Co. of N.Y.*, 45 F.4th at 271 (stating that though FERC "need not allocate costs with exacting precision, the costs assessed against a party must bear some resemblance to the burdens imposed or benefits drawn by that party" (citation omitted)).

## II.    The Parties

Tri-State is a generation-and-transmission cooperative that provides wholesale electricity services to about forty utility members in Colorado, Wyoming, New Mexico, and Nebraska. The utility members—most of them distribution cooperatives—then resell that electricity to their consumer members. Tri-State also provides electricity-transmission services to nonmembers through its Open Access Transmission Tariff (OATT).

To join Tri-State, the utility members entered long-term, all-requirements contracts. Known as Wholesale Electric Service Contracts, these contracts

require members to purchase almost all their electric services from Tri-State through 2050.

By joining Tri-State, members gain a long-term power source, plus an ownership interest in the cooperative. In return, Tri-State gains a stable power market and assured revenues.

The Service Contracts are central to Tri-State's existence. They give Tri-State a secure revenue stream that it can use to grow and maintain operations. The Service Contracts also help Tri-State secure debt financing for its generation and transmission facilities.

The Service Contracts don't mention early termination. But Tri-State's bylaws allow members to "withdraw from membership upon compliance with such equitable terms and conditions as the [Tri-State] Board of Directors may prescribe." Agency R. vol. I at 151.

Intervenors United Power and La Plata were Tri-State members interested in terminating their Service Contracts and leaving Tri-State. So they asked the Colorado Public Utilities Commission to order Tri-State to set a reasonable exit fee.

That effort proved futile. Just a few months before United Power and La Plata sought relief from the Colorado Public Utilities Commission, Tri-State had admitted its first non-utility member. Before that non-utility member's admission, all Tri-State members—and thus Tri-State itself—were exempt from

9

FERC's jurisdiction.[2] But the new member was not. So after admitting the non-utility member, Tri-State asked FERC to exercise jurisdiction over the exit-fee dispute. FERC ultimately concluded that it had jurisdiction over both Tri-State and the exit fee, preempting the Colorado Public Utilities Commission's jurisdiction over the exit-fee dispute.[3]

These four petitions for review deal with the aftermath: FERC's proceedings to identify a just and reasonable exit-fee methodology.

## III.    Procedural History

Below, we summarize the procedural history underlying the petitions. We examine relevant portions of these orders in more detail in our analysis.

### A.    Show-Cause Order

Under section 205 of the Act, Tri-State filed Rate Schedule No. 281 with FERC. That rate schedule proposed an exit-fee methodology for members to terminate their Service Contracts and leave Tri-State. FERC accepted the methodology for filing and established hearing and settlement-judge procedures. *Tri-State Generation & Transmission Ass'n*, 171 FERC ¶ 61,207, at ¶ 1 (2020).

---

[2] FERC lacks jurisdiction over certain exempted electric cooperatives and any corporation "wholly owned" by those exempted cooperatives. 16 U.S.C. § 824(f).

[3] United Power petitioned the D.C. Circuit for review. *United Power*, 49 F.4th at 558. The court denied the petition, concluding that FERC reasonably asserted jurisdiction over Tri-State and that FERC had exclusive jurisdiction over the exit fee. *Id.* at 560, 562.

In June 2021, FERC issued a show-cause order on Tri-State's proposed procedures. *Tri-State Generation & Transmission Ass'n*, 175 FERC ¶ 61,229, at ¶ 1 (2021). FERC "preliminarily" found aspects of Rate Schedule No. 281 unjust and unreasonable. *Id.* ¶ 9. FERC was mainly concerned with Tri-State's failure to provide "clear and transparent procedures" for calculating the exit fee. *Id.* ¶¶ 1, 10–13. So FERC directed Tri-State either to show why its proposal was just and reasonable or to revise the rate schedule to address FERC's concerns. *Id.* ¶¶ 15–16.

**B.     Order Establishing Section 206 Proceedings**

After the show-cause order, Tri-State revised Rate Schedule No. 281. The new filing proposed an exit fee that was the greater of (1) Tri-State's estimated lost revenues from a departing member's early exit, minus certain costs; or (2) a departing member's pro rata share of Tri-State's total debt and other obligations.

FERC accepted the revisions for filing. *Tri-State Generation & Transmission Ass'n*, 177 FERC ¶ 61,059, at ¶ 1 (2021). But again, it preliminarily found that the methodology was not just and reasonable. *Id.* ¶ 119.

First, FERC addressed Tri-State's claim that a lost-revenues approach to the exit fee was the only just and reasonable one. *Id.* ¶ 123. FERC recognized that it had found lost-revenues approaches reasonable in some breach-of-contract cases. *See id.* But it explained that when members terminated their

11

Service Contracts under Rate Schedule No. 281, there would be no breach of contract. *Id.* So FERC concluded that other approaches to the exit-fee methodology might be just and reasonable. *See id.* ¶¶ 123–124.

Along those lines, FERC noted that using a lost-revenues approach may result in a windfall for Tri-State and improperly deter members from exiting. *Id.* ¶ 123. So FERC instructed the parties to explore an exit-fee methodology based on only a departing member's pro rata share of debt and other obligations or one based on a balance-sheet approach. *Id.* ¶ 124.

Second, FERC initiated section 206 proceedings to "ensure that, if necessary, [it] can establish both a just and reasonable methodology for calculating" the exit fee. *Id.* ¶ 120.

## C.    ALJ's Initial Decision

Soon after, a FERC ALJ began hearing procedures. Tri-State, United Power, and FERC Trial Staff each proposed exit-fee methodologies.[4]

Tri-State stuck with its prior approach: the higher of its lost revenues or a departing member's pro rata share of debt and other obligations.

United Power proposed a balance-sheet approach. Under this approach, a departing member would pay its pro rata share of generation-related debt and other liabilities that Tri-State incurred to serve that member, including power

---

[4] Some of Tri-State's members also proposed an exit-fee methodology. That proposal is not relevant here.

purchase agreements (PPAs).[5] To calculate a member's pro rata share, United Power would multiply Tri-State's total generation-related debt and obligations by the departing member's percentage share of patronage capital.[6]

United Power's balance-sheet approach didn't account for transmission-related debt. That's because it assumed that the departing member would keep using Tri-State's transmission services through its OATT. And Tri-State's OATT rate included some charges for transmission-related debt. So in United Power's view, paying for OATT services would cover its share of that debt.

United Power's balance-sheet approach also distinguished between Eastern and Western Interconnection members.[7] Tri-State provides generation and transmission services to its Western Interconnection members. But it serves its Eastern Interconnection members only through agreements with other utilities, including an all-requirements contract with intervenor Basin Electric Power Cooperative. As a result, Tri-State doesn't incur any generation-related

---

[5] PPAs are Tri-State's off-balance-sheet commitments, such as contracts for services with other utilities.

[6] Patronage capital is the excess revenue, after operating expenses and costs, that Tri-State allocates to its members.

[7] Tri-State serves members in two sections of the national electricity grid: the Western Interconnection and the Eastern Interconnection. Most of its members serve consumers in the Western Interconnection. But a few serve consumers in both sections or in the Eastern Interconnection only.

debt to serve its Eastern Interconnection members. So United Power's approach didn't assign any generation-related debt to those members.

Trial Staff proposed a few adjustments to United Power's balance-sheet approach. For example, rather than using patronage capital to calculate a departing member's pro rata share of debt, Trial Staff proposed using the member's average load billings over the past three years. It also proposed that the departing member's exit fee reflect the member's share of both transmission- and generation-related debt.

Yet Trial Staff acknowledged that those members using Tri-State's OATT services after exiting would pay twice for some transmission-related debt. So it proposed offsetting future revenue from the departing member's OATT payments against the member's pro rata share of debt. Under this approach, departing members would contract with Tri-State for OATT services; then Tri-State would reduce the net exit fee by the present value of the OATT payments.

After reviewing an extensive evidentiary record, the ALJ identified a just and reasonable exit-fee methodology: Trial Staff's. *See Tri-State Generation & Transmission Ass'n*, 180 FERC ¶ 63,034, at ¶ 500 (2022).

First, the ALJ rejected Tri-State's lost-revenues approach. *Id.* ¶ 189. She concluded that FERC's order establishing section 206 proceedings precluded her from accepting a lost-revenues approach. *Id.* ¶¶ 190–202. And regardless, she found Tri-State's approach unreasonable because it gave Tri-State a

windfall and deterred members from exiting. *See id.* ¶¶ 228, 233. In fact, the ALJ noted that if every Tri-State member terminated its Service Contract, Tri-State would receive $9.1 billion in exit payments—almost double its total liabilities and triple its debt. *Id.* ¶ 228.

Second, the ALJ rejected United Power's balance-sheet approach. *Id.* ¶¶ 338, 384, 418. She found it inappropriate to rely on patronage capital to determine a departing member's pro rata share of debt. *Id.* ¶ 387. She also determined that excluding transmission-related debt from the exit fee was not just and reasonable. *Id.* ¶¶ 419–24.

Third, the ALJ accepted Trial Staff's balance-sheet approach as just and reasonable. *Id.* ¶ 500. She found that a departing member's three-year average share of billings better captured the member's pro rata portion of Tri-State's debt and other obligations like PPAs. *Id.* ¶ 503. As for transmission-related debt, the ALJ concluded that Trial Staff's balance-sheet approach was just and reasonable because it appropriately accounted for transmission revenues in the exit fee. *Id.* ¶ 512. She likewise approved the transmission offset because it prevented departing members from paying twice for transmission-related debt. *Id.* ¶ 511. That said, she modified Trial Staff's proposal so that the offset included only the debt-related portions of departing members' future OATT payments. *See id.* ¶ 512 & n.922.

D.    Methodology Order

Tri-State and United Power filed exceptions to the ALJ's decision with FERC.[8] On review, FERC agreed with the ALJ that Tri-State's and United Power's proposed exit-fee methodologies were not just and reasonable. *Tri-State Generation & Transmission Ass'n*, 185 FERC ¶ 61,201, at ¶¶ 222, 408 (2023). It then decided that the ALJ's exit-fee methodology—with some modifications—was just and reasonable. *Id.* ¶ 537.

Starting with Tri-State's proposed methodology, FERC clarified that its order establishing section 206 proceedings hadn't precluded the ALJ from considering a lost-revenues approach. *Id.* ¶ 223. Even so, it affirmed the ALJ's reasons for finding a lost-revenues approach inappropriate. *Id.* ¶¶ 234–39.

FERC also reiterated the purpose of Tri-State's exit fee: "to compensate Tri-State for the costs that it has incurred or has an obligation to incur in the future to satisfy its service obligations under the [Service Contract] with the departing member." *Id.* ¶ 227 (citation modified). FERC reasoned that Tri-State's lost-revenues approach "would go beyond compensating Tri-State" for these costs. *Id.*

As for United Power's approach, FERC agreed with the ALJ that relying on patronage capital for a departing member's pro rata share of debt would "run[] contrary to sound economic principles." *Id.* ¶ 409. FERC also affirmed

---

[8] Several other parties also filed exceptions.

16

that United Power's treatment of transmission-related debt was not reasonable. *Id.* ¶ 417. FERC explained that "withdrawing members must pay a pro rata share of Tri-State's debt and other long-term obligations," including transmission-related debt, "to the extent that they caused such costs." *Id.* ¶ 419.

FERC then turned to the ALJ's exit-fee methodology. First, FERC affirmed using a balance-sheet approach. *Id.* ¶ 538. FERC acknowledged that it hadn't used this approach before. *Id.* Still, it concluded that a balance-sheet approach appropriately balanced unique factors at play, including the departing members' ownership interests in Tri-State and the likelihood that departing members would use Tri-State's OATT services. *Id.* Though Tri-State argued that a balance-sheet approach ignored significant costs, FERC reasoned that many of those costs weren't fixed and could be mitigated. *Id.* ¶ 540.

Second, FERC agreed that departing members should pay their pro rata share of generation-related debt and other obligations based on the member's three-year average share of billings. *Id.* ¶ 546.

Third, FERC agreed that Western and Eastern Interconnection members were "not similarly situated." *Id.* ¶ 574. Though "[t]he same [exit-fee] formula is being used for all members, regardless of which interconnection they are located in," FERC concluded that Tri-State should allocate debt and other obligations "based on a member's pro rata share within a specific interconnection." *Id.* ¶ 573.

17

Finally, FERC agreed that including transmission-related debt in the exit fee was just and reasonable. *Id.* ¶ 558. So it instructed Tri-State to calculate transmission-related debt and generation-related debt the same way. *See id.*

Yet FERC rejected the transmission-revenue offset, finding it unworkable. *Id.* ¶ 557. FERC explained that the offset required speculation, was overly burdensome, and posed a "high likelihood" of cost shifts. *Id.* ¶ 559–60. And so, "finding no other just and reasonable treatment for including the transmission-related debt in the record," FERC used its section 206 authority to modify the ALJ's balance-sheet approach. *See id.* ¶ 561.

At its core, FERC's modification swapped the transmission-revenue offset for "a transmission crediting approach" that requires Tri-State "to credit, over time, the full time-value of the transmission-related debt portion of the" exit fee back to the departing member. *Id.* ¶¶ 561–62. The transmission-crediting mechanism works like this: Departing members pay for generation- and transmission-related debt up front in the exit payment. *See id.* ¶ 558. Then Tri-State sets aside the transmission-related-debt portion of that payment. *Id.* ¶ 562. If the departing member uses Tri-State's OATT services, over time, Tri-State credits back the transmission-related-debt portion of the exit payment by applying a credit to the departing member's monthly OATT bill. *Id.*

The transmission credit is "amortized in a straight line over the remaining term of depreciation rates for transmission assets effective" in the OATT rate "at the time notice of withdrawal is given." *Id.* The credit applies to

the departing member's entire OATT bill, not just the debt-related portion. *Id.* If the credit exceeds the monthly bill, then the departing member forfeits the excess. *Id.*

FERC reasoned that an upfront payment would keep Tri-State's "transmission assets" from getting "stranded." *Id.* ¶ 565. And crediting back the payments to departing members would encourage them to keep using Tri-State's services. *Id.* With this in mind, FERC determined that swapping the transmission offset for a transmission credit was just and reasonable. *Id.* ¶ 563.

In sum, FERC concluded that, with its modifications, the ALJ's balance-sheet approach was just and reasonable.[9] *Id.* ¶ 537. FERC then directed Tri-State to submit a compliance filing within thirty days. *Id.* ¶ 1.

### E.    First Compliance Order

As ordered, Tri-State revised Rate Schedule No. 281.

FERC concluded that the filing partially complied with the Methodology Order's directives. *Tri-State Generation & Transmission Ass'n*, 186 FERC ¶61,239, at ¶ 1 (2024). Relevant here, FERC instructed Tri-State to change three things about Rate Schedule No. 281.

First, FERC ordered Tri-State to revise its methodology for calculating transmission-related debt, which did not calculate a departing member's pro

---

[9] We refer to the balance-sheet approach adopted by FERC as "the adopted balance-sheet approach" or "the adopted methodology." We refer to FERC's order as the "Methodology Order."

rata share of debt from the "full amount of Tri-State's transmission-related debt" as FERC had directed. *Id.* ¶ 56 (quoting *Tri-State*, 185 FERC ¶ 61,201, at ¶ 558).

Second, FERC noted that Tri-State's proposal applied the transmission credit to only part of a departing member's OATT bill. *Id.* ¶ 59. Yet the Methodology Order had concluded that the credit should apply to the departing member's entire invoice. *See id.* So FERC directed Tri-State to revise this section of its filing too. *Id.*

Third, FERC discussed Tri-State's treatment of Eastern Interconnection members. *See id.* ¶ 108. Recall that Tri-State serves its Eastern Interconnection members through agreements with other utilities, including an all-requirements contract with Basin. Basin had sued Tri-State in federal district court, asserting breach-of-contract claims related to the potential withdrawal of Tri-State's Eastern Interconnection members. *Id.* ¶ 86.

In response to that lawsuit, Tri-State added language to Rate Schedule No. 281 stating that if a court enjoined Tri-State from allowing member withdrawal, or if a court concluded that withdrawal would breach the Basin contract, Eastern Interconnection members could not withdraw. *Id.* ¶ 87. But FERC found this language beyond the proceedings' scope and ordered Tri-State to remove it. *Id.* ¶¶ 112–14.

Similarly, FERC took issue with Tri-State's exit-fee calculations for Eastern Interconnection members. Rather than calculating a departing

member's pro rata share of the stranded weighted average cost of the Basin contract (a PPA), Tri-State's methodology sought a price that "makes Basin whole under that agreement." *Id.* ¶ 109. Put differently, Tri-State "appear[ed] to be introducing a lost revenues approach for calculating the buyout amount for the Basin [contract]." *Id.* So FERC ordered Tri-State to remove this section of the rate schedule too. *Id.*

## F.     Methodology Rehearing Order

Meanwhile, Tri-State and United Power requested rehearing of FERC's Methodology order.[10] *See generally* 16 U.S.C. § 825*l*(a). FERC denied the requests by operation of law but noted that it would address them in a future order. *Tri-State Generation & Transmission Ass'n*, 186 FERC ¶ 62,071 (2024).

Soon after, FERC entered an order addressing the arguments raised on rehearing, as well as modifying and clarifying the Methodology Order.[11] *Tri-State Generation & Transmission Ass'n*, 187 FERC ¶ 61,101, at ¶ 2 (2024).

First, FERC doubled down on its reasons for rejecting a lost-revenues approach for the exit-fee methodology. *Id.* ¶¶ 20–24. It explained that neither precedent, nor the Service Contracts or Tri-State's bylaws, required it to use a lost-revenues approach. *Id.* ¶¶ 20–21. And it reemphasized that a lost-revenues approach would overcompensate Tri-State. *Id.* ¶ 23.

---

[10] Other parties, including intervenor Mountain Parks, also requested rehearing.

[11] We refer to this order as the "Methodology Rehearing Order."

Second, FERC affirmed its use of a balance-sheet approach. *Id.* ¶ 54. Again, it explained that this approach accounted for departing members' ownership interests in Tri-State and the likelihood that those members would keep using Tri-State's transmission services. *Id.* ¶ 55. FERC also reasoned that a balance-sheet approach aligned with Tri-State's bylaws, the exit fee's purpose, and cost-causation principles. *Id.* ¶¶ 55–56.

Third, FERC affirmed that the adopted balance-sheet approach should apply to Eastern Interconnection members. *See id.* ¶ 67. Tri-State had argued that allowing an Eastern Interconnection member to exit would breach Tri-State's all-requirements contract with Basin. *Id.* ¶ 66. So it asserted that FERC should have considered this potential breach when deciding how to calculate an Eastern Interconnection member's pro rata share of Tri-State's obligations. *See id.*

FERC disagreed. It explained that "what might constitute a breach of the Basin [contract] is not before [it] in this proceeding." *Id.* ¶ 67. And besides, "the potential for a breach . . . would impact the availability of exit payments regardless of the particular [exit-fee] methodology" used. *Id.*

Fourth, FERC affirmed its adoption of a transmission-crediting mechanism. *Id.* ¶ 90. It reiterated that the transmission credit struck a reasonable balance between competing interests: "ensuring that the debt-related costs of Tri-State's transmission assets are recovered through the" exit fee and

"ensuring that the withdrawing member reaps the full benefit of these costs incurred while minimizing cost shifts." *Id.* (citation omitted).

FERC also stood by its conclusion that the credit should apply to a departing member's entire OATT invoice. *Id.* ¶ 91. "Applying the credit to the entirety of the withdrawing member's transmission invoice ensures that the withdrawing member will receive the full benefit of its payment of transmission-related debt." *Id.*

Likewise, FERC affirmed that departing members should forfeit any excess credit. *Id.* ¶¶ 91–92. FERC explained that—whether or not a departing member keeps using Tri-State's transmission services—the member must pay Tri-State for transmission-related debt to avoid cost shifts. *Id.* ¶ 90. And the crediting mechanism simply "provide[s] credit for the paid transmission debt up to the level of service [the departing member] continues to use on the assets for which it paid." *Id.* ¶ 92. Thus, the departing member "should not accumulate credit to the extent [it is] not using" those assets. *Id.*

So in the end, FERC sustained its Methodology Order as modified on rehearing. *Id.* ¶ 6. It then directed Tri-State to submit another compliance filing within thirty days. *Id.* ¶ 2.

G.    **Second Compliance Order**

So Tri-State revised Rate Schedule No. 281 again. Still, Tri-State struggled to get it right. In an order addressing arguments raised on rehearing

23

and on compliance,[12] FERC concluded that Tri-State had only partially complied with the first compliance order's directives. *Tri-State Generation & Transmission Ass'n*, 189 FERC ¶ 61,165, at ¶¶ 55, 82 (2024).

First, Tri-State had included non-networked transmission facilities[13] in its updated calculations for the upfront exit payment—but not in its calculations for the transmission credit. *Id.* ¶ 56. As a result, departing members wouldn't recover "the full value" of the transmission-related-debt portion of the exit fee as FERC had directed. *Id.* So FERC ordered Tri-State "to use a method for allocating the transmission related debt portion of [the exit fee] that ensures *all* transmission-related debt that was included in a withdrawing member's [exit fee] can be recovered through the transmission crediting mechanism, including transmission related debt arising from . . . non-networked transmission facilities." *Id.* ¶ 58.

Second, FERC found that Tri-State was still using a lost-revenues approach to calculate the Eastern Interconnection members' share of the Basin contract. *Id.* ¶ 85. FERC repeated that Tri-State shouldn't design its methodology "to arrive at a price that makes Basin whole." *Id.* Nor should Tri-State assume, when calculating an Eastern Interconnection member's pro rata

---

[12] We refer to this order as the "Second Compliance Order."

[13] Non-networked transmission facilities are typically those that benefit only one Tri-State member. Tri-State's member rates include charges for such facilities. Tri-State's OATT rates, on the other hand, do not.

share of costs, that the member's withdrawal would breach the Basin contract. *Id.* ¶ 87.

In support, FERC directed Tri-State to a concurrently issued order on the Basin contract. *Id.* ¶ 87 & n.149. In a separate proceeding, FERC had concluded that Tri-State would not breach the Basin contract if it allowed an Eastern Interconnection member to withdraw. *See Nw. Rural Pub. Power Dist. v. Basin Elec. Power Coop.*, 189 FERC ¶ 61,164, ¶ 82 (2024). So FERC relied on its findings in that concurrently issued order to explain why the exit-fee methodology shouldn't assume a breach of contract. *See Tri-State*, 189 FERC ¶ 61,165, at ¶ 87.

At the same time, FERC noted that section 9 of the Basin contract should inform Tri-State's calculations. *Id.* That section allows Tri-State to reorganize or "sell, lease or transfer" its Eastern Interconnection assets "so long as Tri-State shall pay such pro rata portion of the outstanding indebtedness, as well as other obligations and commitments of Basin at the time existing, as shall be determined by Basin and shall otherwise comply with such reasonable terms and conditions as Basin shall require." *Nw. Rural Pub. Power Dist.*, 189 FERC ¶ 61,164, at ¶ 11 (citation modified).

Once again, FERC ordered Tri-State to provide another compliance filing. *Tri-State*, 189 FERC ¶ 61,165, at ¶ 3.

25

## H.     Compliance Rehearing Order

Tri-State requested rehearing of FERC's latest compliance order.[14] On rehearing, FERC "continu[ed] to reach the same result" but clarified and modified its prior order.[15] *Tri-State Generation & Transmission Ass'n*, 191 FERC ¶ 61,088, at ¶ 3 (2025).

Tri-State had challenged FERC's decision to include, in the transmission credit, payment for non-networked transmission debt. *Id.* ¶ 22. Tri-State argued that doing so shifted costs to Tri-State and exceeded the credit's purpose of preventing Tri-State from recovering twice for transmission-related debt. *Id.* ¶ 23.

FERC rejected this argument, emphasizing that FERC hadn't limited the credit's purpose to preventing double recovery from OATT rates. *Id.* ¶ 28. Instead, the credit has *two* purposes: preventing double recovery *and* ensuring that the departing member "gets the full transmission benefit it paid for." *Id.* (citation modified). FERC explained that including non-networked debt in the credit satisfied those purposes and presented little risk of cost shifts. *See id.* ¶¶ 28–29.

---

[14] Intervenors United Power, Mountain Parks, Basin, and Northwest Rural also requested rehearing.

[15] We refer to FERC's rehearing order as the "Compliance Rehearing Order."

Tri-State had also challenged FERC's directive on the exit-fee methodology for Eastern Interconnection members. *Id.* ¶ 58. Tri-State argued that FERC ignored the additional costs that Basin could impose under the Basin contract. *Id.* And it argued that FERC's instruction to consider section 9 of the Basin contract did not explain how to properly calculate the exit fee. *Id.* ¶ 59.

FERC again disagreed, pointing to its reasoning in another concurrently issued order on the Basin contract. *Id.* ¶ 64 & n.172 (citing *Nw. Rural Pub. Power Dist. v. Basin Elec. Power Coop.*, 191 FERC ¶ 61,087 (2025)).[16] And FERC restated that Tri-State shouldn't assume a breach of contract when calculating Eastern Interconnection members' exit fees. *Tri-State*, 191 FERC ¶ 61,088, at ¶ 64.

FERC then directed Tri-State to provide another compliance filing. *Id.* ¶ 3.

## I.     Federal Appeals

FERC's orders on the exit-fee methodology sparked four petitions for review.[17]

---

[16] Basin petitioned the D.C. Circuit for review of FERC's orders. *Basin Elec. Power Coop. v. FERC*, Case No. 25-1060. That petition is still pending.

[17] Really, they sparked five. In Case No. 24-9532, United Power also challenged FERC's adopted exit-fee methodology. But before oral argument, United Power voluntarily dismissed its petition.

In Case No. 24-9516, Tri-State challenges FERC's Methodology Order, and in Case No. 24-9538, Tri-State challenges the Methodology Rehearing Order.[18] The clerk's office procedurally consolidated these petitions.

In Case No. 25-9522, Tri-State challenges the Second Compliance Order, and in Case No. 25-9544, Tri-State challenges the Rehearing Compliance Order.[19] The clerk's office procedurally consolidated these petitions too.

We directed the clerk's office to consolidate all four petitions for one oral argument. We likewise address all four petitions in one opinion.

## STANDARD OF REVIEW

We review FERC's orders under the judicial-review standards in the Administrative Procedure Act. *See Elec. Power Supply Ass'n*, 577 U.S. at 291–92.

We will affirm FERC's factual findings if they are supported by "substantial evidence." 5 U.S.C. § 706(2)(E). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fabrizius v. USDA*, 129 F.4th 1226, 1237 (10th Cir. 2025) (citation modified).

---

[18] Basin, Mountain Parks, United Power, La Plata, and Northwest Rural intervened in Case No. 24-9516. Basin, Mountain Parks, United Power, and La Plata intervened in Case No. 24-9538.

[19] United Power, La Plata, Mountain Parks, Northwest Rural, Basin, and San Miguel Power Association, Inc. intervened in Case No. 25-9522. United Power, Mountain Parks, and Northwest Rural intervened in Case No. 25-9544.

We will affirm FERC's other conclusions unless, among other things, they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A conclusion is arbitrary and capricious when the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*W. Watersheds Project v. Haaland*, 69 F.4th 689, 700 (10th Cir. 2023) (citation modified).

In reviewing FERC's decision, "we may not substitute our own judgment for" FERC's. *Elec. Power Supply Ass'n*, 577 U.S. at 292. On the contrary, "we afford great deference to [FERC] in its rate decisions." *Id.* (citation modified). So at bottom, "[o]ur important but limited role" is to ensure that FERC "engaged in reasoned decisionmaking." *Id.* at 295.

### DISCUSSION

Together, these petitions claim that FERC acted arbitrarily and capriciously in four ways: (1) by rejecting a lost-revenues approach for the exit-fee methodology, (2) by adopting a balance-sheet approach for the exit-fee methodology, (3) by adopting the transmission-crediting mechanism and later changing its purpose, and (4) by applying the adopted balance-sheet approach to Eastern Interconnection members despite the Basin contract.

29

We consider—and reject—each challenge in turn.

## I.    Rejecting a Lost-Revenues Approach

Tri-State argues that FERC acted arbitrarily and capriciously by rejecting a lost-revenues approach for the exit-fee methodology.[20]

We disagree. FERC explained that it rejected this approach as (1) violating cost-causation principles by overcompensating remaining members and (2) improperly deterring member withdrawal. *Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 224, 227, 234, 237–38; *Tri-State*, 187 FERC ¶ 61,101, at ¶¶ 23, 34. For example, FERC explained that a lost-revenues approach could allow Tri-State to "recover decades of revenues not yet earned from a departing member, calculated based on decades of projected costs to serve that member that Tri-State *will never actually incur*." *Tri-State*, 185 FERC ¶ 61,201, at ¶ 234 (citation omitted).

FERC also rejected a lost-revenues approach because of the approach's "breach-of-contract foundation." *Id.* ¶ 238. FERC explained that calculating lost revenues over the Service Contract's life "embodies contractual damages, which is not appropriate in contract termination situations such as this, when

---

[20] We note that Tri-State's opening brief doesn't argue that FERC arbitrarily and capriciously concluded that Tri-State failed to meet its section 205 burden of proposing a just and reasonable rate. And Tri-State confirmed during oral argument that it didn't challenge FERC's rejection of its proposed methodology, but instead challenged FERC's broader rejection of a lost-revenues approach. *See* Oral Arg. at 7:55–8:49.

members depart Tri-State with a two-year notice period" under Tri-State's tariff. *Tri-State*, 187 FERC ¶ 61,101, at ¶ 34. Along those lines, FERC explained that nothing entitled Tri-State to "the benefits of economies of scale"—because "economies of scale are a function of [Tri-State] membership, and[] . . . the withdrawal of a member does not constitute a breach of contract." *Tri-State*, 185 FERC ¶ 61,201, at ¶ 230.

Based on this explanation, FERC engaged in "reasoned decisionmaking" when it rejected a lost-revenues approach for the exit-fee methodology. *See Elec. Power Supply Ass'n*, 577 U.S. at 295.

But for two reasons, Tri-State argues that FERC's rejection of a lost-revenues approach was still arbitrary and capricious. First, Tri-State argues that FERC did not "reasonably consider" the parties' contractual obligations. Tri-State Op. Br. at 42. And second, it argues that FERC failed to distinguish relevant precedent.

We reject both arguments.

A.    **Contractual Obligations**

Tri-State asserts that a just and reasonable rate typically "holds sophisticated parties to their bargains." *Id.* at 33 (citation modified). And it emphasizes that its members agreed to remain part of the cooperative and take almost all their electric services from Tri-State through 2050. So it argues that a lost-revenues approach holds departing members to their end of the bargain by compensating Tri-State for the revenues and benefits it would have received

31

had the departing member fulfilled its Service Contract. Put differently, Tri-State wants an exit fee that resembles breach-of-contract damages.

Yet it is undisputed that "there is no breach of contract when a member withdraws from Tri-State pursuant to [its] tariff." *Tri-State*, 185 FERC ¶ 61,201, at ¶ 231. So FERC concluded that there is "no breach of contract that could warrant a remedy of damages in the form of lost revenues." *Tri-State*, 187 FERC ¶ 61,101, at ¶ 20.

We think this reasoning was sound: with no breach of contract, FERC was not required to approve lost-revenues damages here.

Tri-State, though, argues that its bylaws support using a lost-revenues approach anyway. Under the bylaws, a member may withdraw from Tri-State only "upon compliance with such equitable terms and conditions as the Board of Directors may prescribe" and after meeting "all [the member's] contractual obligations." Agency R. vol. I at 151. Withdrawal "shall not release a member from any debts due [to Tri-State] nor impair the obligations of a member under any contract with" Tri-State. *Id.*

But FERC rejected this argument, emphasizing that Tri-State identified no "particular provision that would require the [exit fee] to be based on a lost revenues calculation." *Tri-State*, 187 FERC 61,101, at ¶ 21. FERC further concluded that, absent a breach of contract, neither the Service Contracts nor the bylaws entitled Tri-State and its remaining members to the benefits of economies of scale. *See Tri-State*, 185 FERC ¶ 61,201, at ¶ 230.

32

We agree with FERC. Tri-State's bylaws say nothing about what happens when Tri-State releases a member from its contractual obligations under a tariff. Nor do the bylaws state that the only way a member can cover its "debts due" or meet its obligations is by paying Tri-State for its lost revenues. Indeed, both the Service Contracts and the bylaws are silent about how to calculate an exit fee. *See id.* ¶ 70 ("[I]t is undisputed that neither the Bylaws nor the [Service Contracts] prescribe how [exit fees] should be calculated.").

Simply put, neither the Service Contracts nor the bylaws mandate a lost-revenues approach. So Tri-State hasn't shown that FERC acted contrary "to the evidence before" it when it rejected a lost-revenues approach for the exit fee. *See W. Watersheds Project*, 69 F.4th at 700 (citation omitted).

## B.     Precedent

Tri-State argues that FERC ignored four decisions that supported using a lost-revenues approach: *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346 (10th Cir. 1989); *Town of Norwood v. FERC*, 202 F.3d 392 (1st Cir. 2000); *Am. Wind Energy Ass'n The Wind Coal. v. Sw. Power Pool, Inc.*, 167 FERC ¶ 61,033 (2019); and *Wabash Valley Power Ass'n*, 178 FERC ¶ 63,005 (2022).

In general, Tri-State is right that "FERC's failure to come to terms with its own precedent reflects the absence of a reasoned decisionmaking process." *New England Power Generators Ass'n v. FERC*, 881 F.3d 202, 213 (D.C. Cir. 2018) (citation omitted). But that's not what happened here. We agree with

33

FERC that none of these decisions control. *See Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 231–33; *Tri-State*, 187 FERC ¶ 61,101, at ¶¶ 20–21.

        **1.**     *Shoshone*

Like the distribution-cooperative members at issue here, Shoshone had a long-term, all-requirements contract with Tri-State. *Shoshone*, 874 F.2d at 1349. Yet Shoshone sold its assets to another utility company. *Id.* at 1350. So Tri-State sued for breach of contract, seeking both damages and injunctive relief. *Id.* A jury found in Tri-State's favor, but the district court denied injunctive relief and ordered a new trial. *Id.* at 1350–51. Tri-State filed an interlocutory appeal. *Id.* at 1351.

We held that Shoshone and Tri-State had an implied agreement that Shoshone would remain in business and maintain requirements under the contract. *Id.* at 1356, 1360. And we reached that conclusion by reading the all-requirements contract in connection with the entire cooperative system. *Id.* at 1359. Specifically, we explained that the contracts were "an assured source of repayment and security for" Tri-State's loans and "an essential factor to [Tri-State's] cohesiveness and financial strength." *Id.* at 1349–50. We noted that "the all-requirements contract and the entire enterprise of the parties" was "based on the continuance of the contract throughout the agreed-upon term, especially in light of the cooperative nature of the Tri-State system, the role the all-requirements contract plays in the cooperative venture, and the participation and interrelationship of the individual cooperatives." *Id.* at 1357.

So based on that implied agreement, we ruled that Shoshone would breach its all-requirements contract if it sold its assets when it still had members that required electric power. *Id.* at 1360. As for a remedy, we suggested that damages for "the present value of what it would have realized over the [contract's] life" would make Tri-State whole. *Id.* at 1361.

Here, FERC distinguished *Shoshone* by explaining that it involved a breach of contract. *Tri-State*, 185 FERC ¶ 61,201, at ¶ 231. In contrast, when a member exits Tri-State under its tariff, there is no breach of contract. *Id.*

We agree with FERC that this key difference—exiting by breaching a contract versus exiting under a tariff—was enough to distinguish *Shoshone*.

Tri-State also relies on *Shoshone* to showcase the Service Contracts' importance to its cooperative model. Tri-State argues that when FERC distinguished *Shoshone*, it minimized departing members' obligations under the Service Contracts.

But again, neither the Service Contracts nor the bylaws require a lost-revenues approach or entitle Tri-State to economies-of-scale benefits. So here, *Shoshone* simply confirms that the "contractual relationship" between Tri-State and its members is "a unique one." 874 F.2d at 1359.

### 2. *Norwood*

In *Norwood*, New England Power, a wholesale electric-power supplier, had long-term requirements contracts to provide electricity to other utilities. 202 F.3d at 396. Those utilities, including Norwood, could terminate the

35

contract only after providing seven years' notice. *Id.* at 399. But Norwood sought to terminate its contract with New England Power without the required notice. *See id.* at 397–98. So New England Power proposed tariff revisions that would allow utilities to terminate their contracts with thirty days' notice instead. *Id.* at 397. Under that proposal, utilities could terminate their contracts on short notice by paying an exit fee to cover the revenues New England Power would have collected had the member fulfilled the contract term. *Id.*

FERC approved the exit fee, and Norwood petitioned the First Circuit for review. *Id.* at 398. The First Circuit upheld the fee. *Id.* at 398–402, 408.

Here, FERC distinguished *Norwood* by noting that the decision examined inputs to a preexisting exit-fee formula. 187 FERC ¶ 61,101, at ¶ 20. FERC also explained that Norwood "terminated its contract without availing itself of the [effective] tariffs," while here there is "no breach of contract that could warrant [lost-revenues] damages." *Id.*

We agree with Tri-State that this characterization of *Norwood* doesn't hold up. *Norwood* didn't examine "inputs" to an existing exit fee. In fact, as the First Circuit explained, Norwood's "main attack" was on FERC's "approval" of an exit fee New England Power proposed in its tariff. *Norwood*, 202 F.3d at 398. We face a similar issue here: whether FERC acted arbitrarily and capriciously in approving an exit-fee methodology.

As for a breach of contract, the First Circuit concluded that FERC hadn't decided whether Norwood breached its contract. *Id.* at 400. Instead, FERC

36

upheld, "on a generic basis, a termination charge for those customers who are bound by existing contracts but wish to avoid their obligations." *Id.* Again, that's the same issue here.

All that said, FERC's conclusion that *Norwood* doesn't require a lost-revenues approach was not arbitrary and capricious. We agree with FERC and the ALJ that "key factual differences" exist between *Norwood* "and the case at hand." *See Tri-State*, 180 FERC ¶ 63,034, at ¶ 209; *Tri-State*, 185 FERC ¶ 61,201, at ¶ 232. Indeed, "we cannot conclude that [FERC's] finding was undermined by other cases in which it faced different claims in procedurally distinct proceedings and reached different results based on distinct records." *Int'l Transmission Co. v. FERC*, 988 F.3d 471, 484 (D.C. Cir. 2021). And *Norwood* involved different contracts and different circumstances from those at issue here. For example, *Norwood* considered a contract-termination charge for members exiting without contractually required notice. *See id.* at 397. But here, members departing under Tri-State's tariff must provide two years' notice, which allows Tri-State to adapt its operations and prepare for the member's departure. *Tri-State*, 185 FERC ¶ 61,201, at ¶ 540. Plus, nothing in *Norwood* mandates the use of a lost-revenues approach anytime a cooperative member exits an all-requirements contract.

Thus, we are not persuaded that FERC "fail[ed] to come to terms with" precedent when it concluded that *Norwood* did not control. *See New England Power Generators Ass'n*, 881 F.3d at 213 (citation omitted); *cf. Zzyym v.*

37

*Pompeo*, 958 F.3d 1014, 1033 (10th Cir. 2020) ("[A] court can sometimes discern from the record whether the agency would have reached the same decision without relying on the unsupported reasons.").

### 3.    *American Wind*

American Wind was a member of a transmission cooperative. *See Am. Wind Energy Ass'n Wind Coal.*, 167 FERC ¶ 61,033, at ¶ 1. To withdraw from the cooperative, members had to pay an exit fee under a formula established in the cooperative's governing documents. *Id.* ¶ 3. American Wind filed a complaint with FERC, alleging that the exit fee was unlawful as applied to non-transmission owners. *Id.* ¶ 1.

FERC partially granted the complaint. *Id.* ¶ 2. It found that the exit fee for non-transmission owners "create[d] a barrier to membership, [was] not needed to maintain [the cooperative's] financial solvency or avoid cost shifts, and [was] excessive as a means of ensuring stability in membership and members' financial commitment." *Id.* ¶ 50. FERC also discussed exit fees generally, explaining that they should cover the cooperative's costs and service its debt, prevent cost shifts, and promote member stability. *Id.* ¶ 59.

To Tri-State, *American Wind* establishes that contract-termination payments must "place[] remaining members in the same financial position as if

the member had completed the full term of its obligations."[21] Tri-State Op. Br. at 34.

But like FERC, we read *American Wind* differently. *See Tri-State*, 185 FERC ¶ 61,201, at ¶ 233. That decision never mentions a lost-revenues approach, let alone concludes that all just and reasonable exit fees must account for lost revenues. True, it counsels that exit fees should cover costs, service debt, prevent cost shifts, and provide stability. But it never states that using a lost-revenues approach is the only way to meet those goals. So FERC reasonably concluded that *American Wind* did not compel it to adopt a lost-revenues approach here.[22]

---

[21] Relatedly, throughout its briefing, Tri-State argues that the exit fee's purpose is to put Tri-State in the same financial position as if the departing member had fulfilled its obligations under its Service Contract. But in separate proceedings, FERC concluded that the exit fee's purpose "is to compensate Tri-State for the costs that it has incurred or has an obligation to incur in the future to satisfy its service obligations under the [Service Contracts] with the departing member." *Tri-State Generation & Transmission Ass'n*, 172 FERC ¶ 61,173, at ¶ 32 (2020). And we note that on appeal, the D.C. Circuit found this description of the exit charge "persuasive," albeit when deciding whether FERC had exclusive jurisdiction over the exit-fee dispute. *United Power*, 49 F.4th at 561. The D.C. Circuit further explained that the exit fee should protect Tri-State "against rate increases caused by the exit of a member, while also increasing membership commitment and stability," and should "cover the costs that a cooperative incurs to provide full requirements service to the member." *Id.* (citation modified). With this in mind, we doubt Tri-State's characterization of the exit-fee's purpose.

[22] Even if *American Wind* controls, FERC can pivot from its precedent if it adequately explains its reasons. *See Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 669 (D.C. Cir. 2009).

4.    *Wabash*

Lastly, Tri-State points to *Wabash*, where a FERC ALJ approved using a lost-revenues approach for another generation-and-transmission cooperative's exit fee. 178 FERC ¶ 63,005, at ¶¶ 74–77. FERC dismissed Tri-State's *Wabash* arguments because the ALJ's decision in that case was not precedential. *Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 231–32; *Tri-State*, 187 FERC ¶ 61,101, at ¶ 21.

We agree with this reasoning. Because *Wabash* is an ALJ decision, it is nonprecedential and does not bind FERC. *See Tri-State*, 187 FERC ¶ 61,101, at ¶ 21; *see generally* Christopher J. Walker, Melissa Wasserman & Matthew Lee Wiener, Precedential Decision Making in Agency Adjudication app. E at 33–35 (Dec. 6, 2022) (report to the Admin. Conf. of the U.S.). Thus, it wasn't arbitrary and capricious for FERC to reject Tri-State's *Wabash* arguments on that ground. *See RMI Co. v. Sec'y of Lab.*, 594 F.2d 566, 571 n.13 (6th Cir. 1979) (holding that when a commission "is not bound by unreviewed ALJ decisions," there is "no merit" to the argument that one of the commission's orders is "unreasonable as contrary to numerous ALJ decisions").

So all in all, none of the cases Tri-State relies on establish that FERC had to adopt a lost-revenues approach for Tri-State's exit fee. What's more, FERC

gave "reasoned explanation[s]" for why most of these cases did not control.[23]

*See New England Power Generators Ass'n*, 881 F.3d at 210 (citation omitted).

\* \* \*

In sum, Tri-State has not shown that FERC's rejection of a lost-revenues approach for the exit fee was arbitrary and capricious in violation of the APA. Our "limited role is to ensure that [FERC] engaged in reasoned decisionmaking," i.e., that it "weighed competing views" and "intelligibly explained the reasons for making [its] choice." *Elec. Power Supply Ass'n*, 577 U.S. at 295. FERC met that standard here.

## II.    Adopting a Balance-Sheet Approach

Next, Tri-State argues that FERC acted arbitrarily and capriciously by adopting a balance-sheet approach for the exit-fee methodology.

To recap, under the adopted balance-sheet approach, a departing member makes a lump-sum payment reflecting its pro rata share of Tri-State's debts and other obligations. *Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 546, 558. Tri-State calculates that pro rata share using an unconsolidated FERC Form No. 1

---

[23] Though we think FERC misread *Norwood*, we view this "minor misstatement of law" to be "an unfortunate lapse" that did not render FERC's decision to reject a lost-revenues approach arbitrary and capricious. *See Zzyym*, 958 F.3d at 1034 (citation omitted); *see also Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 669 (D.C. Cir. 2009) (holding that contrary precedent gives the court "no more power than usual to question [an agency]'s substantive determinations" and that courts "still ask only whether [the agency] has adequately explained the reasons for its current action and whether those reasons themselves reflect a clear error of judgment" (citation modified)).

balance sheet.[24] *Id.* ¶ 244. Tri-State also credits the transmission-related-debt portion of the payment to departing members that keep using Tri-State's transmission services. *Id.* ¶ 557.

Again, we ask only whether FERC "engaged in reasoned decisionmaking—that it weighed competing views, selected a[n] [exit-fee] formula with adequate support in the record, and intelligibly explained the reasons for making that choice." *Elec. Power Supply Ass'n*, 577 U.S. at 295.

Here, too, FERC satisfied that standard. To start, we have no doubt that FERC sufficiently weighed competing views on the best approach to the exit-fee methodology. In a 200-plus page order, FERC assiduously weighed the proposed exit-fee methodologies and the parties' competing views. *See Tri-State*, 185 FERC ¶ 61,201. It then reweighed the methodologies and competing views on rehearing. *See Tri-State*, 187 FERC ¶ 61,101.

Next, record evidence supported a balance-sheet approach. In adopting this approach, the ALJ relied on testimony from Trial Staff witnesses. *See, e.g.*, Tri-State, 180 FERC ¶ 63,034, at ¶¶ 501–03, 511–12, 515–16. And FERC, too, pointed to record evidence supporting its reasons for adopting a balance-sheet approach. *See, e.g.*, *Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 540–43; *Tri-State*, 187 FERC ¶ 61,101, at ¶¶ 34, 55–57. For example, FERC cited evidence supporting that Tri-State could re-optimize for load loss and that a balance-sheet approach

---

[24] Certain electric utilities must file an annual report with FERC using FERC Form No. 1. *See* 18 C.F.R. § 141.1.

was unlikely to increase Tri-State's member rates. *See Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 540–41.

Finally, FERC "intelligibly explained the reasons for" adopting a balance-sheet approach. *Elec. Power Supply Ass'n*, 577 U.S. at 295. First, FERC determined that a balance-sheet approach best fit "the situation here." *Tri-State*, 185 FERC ¶ 61,201, at ¶ 538. FERC clarified that leaving Tri-State was "not analogous to a withdrawal from long-term requirements contracts, because it involves additional complications." *Id.* These "complications" included (1) departing members' ownership interests in Tri-State, (2) the likelihood that departing members would keep using Tri-State's transmission services after departure, and (3) the parties' obligations under the bylaws and Service Contracts. *See id.* FERC concluded that a balance-sheet approach best accounted for these unique considerations. *See Tri-State*, 187 FERC ¶ 61,101, at ¶ 55.

Second, FERC highlighted the exit fee's two-year notice period, reasoning that it would allow Tri-State to mitigate many costs not captured on the balance sheet. *Tri-State*, 185 FERC ¶ 61,201, at ¶ 540; *see also Tri-State*, 187 FERC ¶ 61,101, at ¶ 34.

And third, FERC concluded that a balance-sheet approach satisfied the exit fee's purpose—"to compensate Tri-State for the costs that it has incurred or has an obligation to incur in the future to satisfy its service obligations under

43

the [Service Contract] with the departing member"—without violating cost-causation principles. *Tri-State*, 187 FERC ¶ 61,101, at ¶ 56 (citation modified).

Thus, we conclude that FERC engaged in reasoned decisionmaking when it adopted a balance-sheet approach for the exit-fee methodology. *See Elec. Power Supply Ass'n*, 577 U.S. at 295.

Tri-State's counterarguments don't persuade us otherwise. First, Tri-State emphasizes that using a balance-sheet approach is "novel" and "unprecedented." Tri-State Op. Br. at 6. But an agency decision isn't arbitrary and capricious just because it takes a new approach. Agencies can change position or adopt new policies if they provide a reasoned explanation for doing so. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *Qwest Corp. v. FCC*, 689 F.3d 1214, 1230–31 (10th Cir. 2012). And here, FERC acknowledged that it was taking a new approach, then justified using that approach under the case's specific circumstances. *See Tri-State*, 185 FERC ¶ 61,201, at ¶ 538.

Second, Tri-State argues that a balance-sheet approach ignores the parties' contractual obligations. But again, neither the Service Contracts nor the bylaws require a certain exit-fee methodology. FERC also explained that a balance-sheet approach was "consistent" with the bylaws because it ensures that departing members pay their pro rata share of Tri-State's debts. *See Tri-State*, 187 FERC ¶ 61,101, at ¶ 55.

44

Tri-State, though, asserts that by ignoring the Service Contract's term, the balance-sheet approach "undercompensat[es] Tri-State in the first years of a [Service Contract] but overcompensat[es] if the member departs shortly before a [Service Contract] expires." Tri-State Op. Br. at 54. To illustrate, Tri-State argues that a member departing with only one year left on its Service Contract would pay more under the balance-sheet approach than the cost of Tri-State's all-requirements services through the end of the contract term. By contrast, Tri State argues that if a member departs at the beginning of the contract term, the balance-sheet approach vastly undercompensates Tri-State by ignoring the revenues it would have received over the contract's life.

But FERC considered this argument and rejected it. *See Tri-State*, 185 FERC ¶ 61,201, at ¶ 539. Again, the exit fee must "compensate Tri-State for the costs that it has incurred or has an obligation to incur in the future to satisfy its service obligations under the [Service Contract] with the departing member." *Id.* ¶ 227 (citation modified). So departing members' exit fees include more than just the cost of transmission services—they also must pay their pro rata share of debt and other obligations that Tri-State incurred to serve them. *Id.* ¶ 419. As a result, it makes sense that a member departing with one year left on its Service Contract would pay for more than just the cost of transmission services for that year, assuming there are other debts and obligations that Tri-State incurred on the member's behalf. As for a member departing at the beginning of the contract term, nothing in the Service Contract

45

entitles Tri-State to lost revenues. So it also makes sense that the adopted balance-sheet approach doesn't capture those prospective costs.

Third, Tri-State argues that a balance-sheet approach excludes significant fixed costs—up to "two-thirds of Tri-State's revenue requirement"—and thus shifts those costs to Tri-State's remaining members. Tri-State Op. Br. at 53. As examples, Tri-State contends that the balance-sheet approach overlooks costs that it will incur for labor, systems operations, insurance, regulatory compliance, and human and legal resources. By excluding these costs, Tri-State argues that the balance-sheet approach gives departing members a windfall and increases costs for remaining members.

Yet FERC weighed these arguments and found them lacking. FERC reasoned that most of the fixed costs Tri-State identified could be avoided or mitigated, especially with the two-year notice period. *Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 540–41; *Tri-State*, 187 FERC ¶ 61,101, at ¶¶ 34, 51, 56. Plus, FERC supported its reasoning with record evidence. *See Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 540–41; *Tri-State*, 187 FERC ¶ 61,101, at ¶¶ 34, 56. Simply put, FERC "weighed competing views . . . and intelligibly explained the reasons for making [its] choice." *Elec. Power Supply Ass'n*, 577 U.S. at 295.

Fourth, Tri-State argues that FERC didn't respond meaningfully to its concerns that a balance-sheet approach could impact its credit rating or its contracts with other entities. True, "[i]t is well established that [FERC] must

46

respond meaningfully to the arguments raised before it." *New England Power Generators Ass'n*, 881 F.3d at 210 (citation modified).

But here, too, FERC considered Tri-State's arguments and responded reasonably. Citing the record, FERC explained that Tri-State's concerns about its credit rating predated the proceedings, and that "it would be inappropriate for the [exit-fee] payment to shield Tri-State from its other business risks." *Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 571–72; *see also Tri-State*, 187 FERC ¶ 61,101, at ¶ 23. FERC also relied on evidence that Tri-State could maintain its credit rating under the balance-sheet approach. *Tri-State*, 185 FERC ¶ 61,201, at ¶ 572. That was enough to meet FERC's obligation. *See Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 20 (D.C. Cir. 2021) (finding that FERC responded meaningfully when it "expressly acknowledged" and "necessarily rejected" an argument).

FERC also considered whether the balance-sheet approach would cause a "Member Termination Event"[25] under Tri-State's other contracts. *Tri-State*, 185 FERC ¶ 61,201, at ¶ 572. FERC answered no, reasoning that the adopted methodology gave Tri-State "significant liquidity" from the lump-sum payment, plus time to mitigate costs. *Id.* What's more, because the balance-sheet

---

[25] A Member Termination Event "is triggered only if withdrawing members do not pay their pro rata shares of debts and other obligations to Tri-State." *Tri-State*, 185 FERC ¶ 61,201, at ¶ 243; *see also id.* ¶ 92. If triggered, "Tri-State's lenders could take actions that Tri-State alleges would have significant negative consequences on remaining members." *Id.* ¶ 243.

approach would allow Tri-State to recover its debts, FERC reasoned that this approach would in fact *prevent* a Member Termination Event. *See Tri-State*, 187 FERC ¶ 61,101, at ¶ 43.

Fifth, Tri-State argues that a balance-sheet approach contradicts precedent like *Norwood* and *Wabash*. But as discussed, the cases Tri-State cites do not control. So for the same reasons as before, we are not persuaded by Tri-State's precedent-based arguments.

Finally, Tri-State argues that adopting a balance-sheet approach was arbitrary and capricious because the approach (1) excludes short-term debt, (2) overcompensates departing members through the transmission-crediting mechanism, and (3) ignores Tri-State's contract with Basin. Put differently, Tri-State attacks discrete parts of the balance-sheet approach.

Yet Tri-State never explains how these aspects of the adopted methodology make FERC's *decision to use* a balance-sheet approach arbitrary and capricious.[26] So we aren't persuaded by these arguments, either.

\*     \*     \*

---

[26] To the extent that Tri-State argues that these aspects of the balance-sheet approach are arbitrary and capricious in themselves, we address the transmission credit and FERC's applying the exit-fee methodology to Eastern Interconnection members in different sections of this opinion. As for short-term debt, FERC supported its conclusion that Tri-State recovers that debt through its current rates. *See Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 244, 580 & n.937; *Tri-State*, 187 FERC ¶ 61,101, at ¶¶ 101–02.

FERC, "not this or any other court, regulates electricity rates." *Elec. Power Supply Ass'n*, 577 U.S. at 295. Choosing an appropriate exit-fee methodology "involves both technical understanding and policy judgment." *Id.* In selecting a balance-sheet approach, FERC "addressed th[is] issue seriously and carefully, providing reasons in support of its position and responding to the principal alternative advanced." *Id.* So FERC did not act arbitrarily and capriciously by adopting that approach for the exit-fee methodology.

## III.    Adopting the Transmission-Crediting Mechanism

Tri-State challenges two aspects of the transmission-crediting mechanism. First, Tri-State attacks FERC's decision to apply the transmission credit to a departing member's entire OATT invoice. And second, Tri-State challenges FERC's decision to include payment for non-networked debt in the transmission credit. Specifically, Tri-State argues that by directing it to include payment for non-networked debt in the credit, FERC's compliance orders altered the credit's purpose without explanation.

### A.    Applying the Credit to the Entire OATT Invoice

Recall that under the adopted balance-sheet approach, departing members pay an upfront fee for generation- and transmission-related debt. *Tri-State*, 185 FERC ¶ 61,201, at ¶ 558. If a departing member uses Tri-State's OATT services, Tri-State over time credits the transmission-related-debt portion of the exit-fee payment against the member's monthly OATT bill. *Id.* ¶ 562.

49

Tri-State contends that applying the transmission credit to a departing member's entire OATT invoice is arbitrary and capricious because it overcompensates that member and exceeds the transmission credit's purpose of preventing double recovery.

Yet FERC considered these arguments and reasonably rejected them. On rehearing, FERC explained that "[a]pplying the credit to the entirety of the withdrawing member's transmission invoice ensures that the withdrawing member will receive the full benefit of its payment of transmission-related debt." *Tri-State*, 187 FERC ¶ 61,101, at ¶ 91. By contrast, applying the credit to only transmission-related debt would create a windfall for Tri-State. *Id.* ("[W]hile the transmission credit is calculated by dividing Tri-State's transmission-related debt among its members, Tri-State also receives payments toward transmission-related debt by non-member transmission tariff customers."). Indeed, "if the transmission credit were to be applied only to the transmission-related debt portion of a withdrawn member's transmission invoice, the transmission credit would likely often exceed the transmission related debt portion of the invoice." *Id.*

So here, too, FERC "examined the relevant considerations and articulated a satisfactory explanation for its action." *Elec. Power Supply Ass'n*, 577 U.S. at 292 (citation modified). And again, we may not substitute our judgment for FERC's. *Id.* Nor do we ask whether "FERC made the better call" when "reasonable minds [could] differ" on the best approach. *Id.* at 295. Thus, Tri-

50

State has not shown that FERC acted arbitrarily and capriciously by applying the credit to a departing member's entire OATT invoice.

## B.    Including Non-Networked Debt in the Credit

Tri-State argues that FERC acted arbitrarily and capriciously by including payment for non-networked debt in the transmission credit. Specifically, Tri-State argues that by including such payment in the credit, FERC changed the transmission-crediting mechanism's purpose without sufficient explanation.

Recall that in the compliance proceedings, Tri-State did not initially include non-networked debt in its transmission-related-debt calculations. *See Tri-State*, 186 FERC ¶ 61,239, at ¶ 56. Yet FERC had instructed Tri-State to calculate a departing member's pro rata share from the "full amount of Tri-State's transmission-related debt." *Id.* (quoting *Tri-State*, 185 FERC ¶ 61,201, at ¶ 558). So FERC ordered Tri-State to revise its calculations. *Id.*

Tri-State's next filing included non-networked transmission debt in its calculations for the lump-sum exit payment—but not in its calculations for the credit. *See Tri-State*, 189 FERC ¶ 61,165, at ¶ 56. So FERC again instructed Tri-State to include payment for non-networked debt in the credit so that departing members would recover "the full value" of the transmission-related-debt portion of their exit payments. *Id.* ¶¶ 56, 58.

Tri-State argues that FERC's compliance orders changed the transmission credit's purpose without acknowledgment or reasoning. *See generally Fox*

51

*Television Stations*, 556 U.S. at 515–16 (explaining that an agency acts arbitrarily and capriciously by failing to acknowledge or properly explain its reasons for changing policy). In Tri-State's view, the transmission credit's purpose is to prevent Tri-State from recovering twice for transmission-related debt—once in the upfront exit payment and again in the departing member's OATT payments. So Tri-State asserts that FERC "expanded" the credit's purpose by directing Tri-State to return the "*full* time-value of the transmission-related debt portion of the" exit fee, and that this change shifted the cost of transmission-related debt onto Tri-State. Tri-State Op. Br. Compl. at 39 (citation omitted).

Tri-State's challenge fails because FERC never changed the transmission credit's purpose. True, FERC implemented the transmission-crediting mechanism to prevent Tri-State from recovering twice for transmission-related debt. But that was never the *only* reason FERC adopted the credit. From the start, FERC made clear that the credit had other purposes: ensuring "that the debt-related costs of Tri-State's transmission assets are recovered through the" exit fee and "that the withdrawing member reaps the full benefit of these costs incurred while minimizing cost shifts." *Tri-State*, 187 FERC ¶ 61,101, at ¶ 90 (citation omitted); *see also Tri-State*, 185 FERC ¶ 61,201, at ¶ 563.

Indeed, FERC consistently reasoned that the transmission-crediting mechanism must return "the full time-value of the transmission-related debt portion" of the exit fee to departing members. *See Tri-State*, 185 FERC ¶

61,201, at ¶ 562; *see also id.* ¶¶ 557–58, 563–64, 581; *Tri-State*, 187 FERC ¶ 61,101, at ¶¶ 90–91; *Tri-State*, 189 FERC ¶ 61,165, at ¶¶ 56–58; *Tri-State*, 191 FERC ¶ 61,088, at ¶¶ 28–29. That includes returning the departing member's payment for non-networked debt. *See Tri-State*, 189 FERC ¶ 61,165, at ¶ 56. So FERC did not alter the transmission-crediting mechanism's purpose when, in its compliance orders, it directed Tri-State to include non-networked debt in the transmission credit.

In fact, the Methodology Rehearing Order acknowledged concerns that Tri-State's member rates—which underpinned the exit-fee payment—included charges for non-networked facilities. *See Tri-State*, 187 FERC ¶ 61,101, at ¶¶ 76, 95. And FERC rejected these concerns by explaining that though "the monthly transmission credit is directly tied to the portion of the [exit-fee payment] based on Tri-State's transmission-related debts, the rates against which the credit is applied are not." *Id.* ¶ 95. This, too, shows that FERC never limited the transmission credit's purpose to preventing Tri-State from recovering twice for transmission-related debt. So all in all, Tri-State's arguments that FERC changed course in its compliance orders fall flat.

We therefore conclude that Tri-State has not shown that FERC acted arbitrarily and capriciously in adopting the transmission-crediting mechanism.

53

IV.    **Applying the Balance-Sheet Approach to Eastern Interconnection Members**

Tri-State and intervenor Basin argue that FERC acted arbitrarily and capriciously by ordering that the adopted balance-sheet approach apply to Eastern Interconnection members despite the Basin contract.[27] They contend that by applying the methodology to these members, FERC ignored "an important aspect of the problem": how to handle the Basin contract in Eastern Interconnection members' exit fees. *See W. Watersheds Project*, 69 F.4th at 700 (citation omitted).

According to Tri-State, if an Eastern Interconnection member exits, the Basin contract allows Basin to assess costs against Tri-State. Tri-State argues that by not incorporating these "unknown" costs into the exit fee, FERC "nearly assures that remaining members will have to pay costs [that] Basin" "could impose" for an Eastern Interconnection member's exit. Tri-State Op. Br. Compl. at 8, 52.

Tri-State first raised its concerns about the Basin contract when it sought FERC's review of the ALJ's initial decision. *See Tri-State*, 185 FERC ¶ 61,201, at ¶¶ 482–83. On rehearing, FERC clarified that "what might constitute a

---

[27] To the extent that Basin argues that FERC acted arbitrarily and capriciously by not creating an exit-fee methodology for Eastern Interconnection members, we disagree. FERC's Methodology Order directed Tri-State to use the same exit-fee formula "for all members, regardless of which interconnection they are located in." *Tri-State*, 185 FERC ¶ 61,201, at ¶ 573.

breach" of the Basin contract was outside the proceedings' scope. *Tri-State*, 187 FERC ¶ 61,101, at ¶ 67. Specifically, it reasoned that deciding what breached the Basin contract and what made a just and reasonable exit-fee methodology were distinct questions. *See id.* ("[T]he potential for a breach and the consequences thereof would impact the availability of exit payments regardless of the particular [exit-fee] methodology.").

Tri-State raised similar concerns in the compliance proceedings. It argued that its approach was appropriate because it was "obligated under the Basin [contract] to fulfill through Basin all capacity and energy that Tri-State's Eastern Interconnection members require until 2050," leaving "the costs associated [with] a withdrawing member's requirements . . . stranded." *Tri-State*, 189 FERC ¶ 61,165, at ¶ 87.

But FERC disagreed, referring to its reasoning in a separate proceeding: *Northwest Rural Public Power District*, 189 FERC ¶ 61,164. *See Tri-State*, 189 FERC ¶ 61,165, at ¶ 87 & n.149. There, FERC concluded that Tri-State would not breach the Basin contract by allowing an Eastern Interconnection member to exit. *Nw. Rural Pub. Power Dist.*, 189 FERC ¶ 61,164, at ¶ 82. So FERC told Tri-State not to assume, when calculating an Eastern Interconnection member's pro rata share of costs, that the member's withdrawal would breach the Basin

55

contract. *Tri-State*, 189 FERC ¶ 61,165, at ¶ 87. FERC also instructed Tri-State to consider section 9 of the Basin contract when calculating the fee.[28] *Id.*

On rehearing, FERC repeated these instructions and referred Tri-State to its concurrently issued rehearing order in *Northwest Rural Public Power District*, 191 FERC ¶ 61,087. *See Tri-State*, 191 FERC ¶ 61,088, at ¶ 64.

We think FERC reasonably handled this issue in both the methodology and compliance orders. FERC has "broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities." *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) (citation modified). And whether an Eastern Interconnection member's exit breached the Basin contract was an issue FERC chose to address in a separate proceeding. That decision wasn't arbitrary and capricious. As FERC explained, the exit-fee methodology and Tri-State's obligations under the Basin contract are distinct issues. *See Tri-State*, 187 FERC ¶ 61,101, at ¶ 67. Regardless of the methodology used, a breach of the Basin contract affects a member's ability to exit Tri-State. *See id.* So any potential breach does not bear on a generally applicable exit-fee methodology.

---

[28] That section states that Tri-State may transfer its Eastern Interconnection assets "so long as Tri-State shall pay such pro rata portion of the outstanding indebtedness, as well as other obligations and commitments of Basin at the time existing, as shall be determined by Basin and shall otherwise comply with such reasonable terms and conditions as Basin shall require." *Nw. Rural Pub. Power Dist.*, 189 FERC ¶ 61,164, at ¶ 11 (citation modified).

Besides, in the *Northwest Rural Public Power District* proceedings, FERC concluded that Tri-State wouldn't breach the Basin contract by allowing an Eastern Interconnection member to withdraw. 189 FERC ¶ 61,164, at ¶ 82. Based on that determination, FERC reasonably instructed Tri-State not to assume a breach of contract when calculating an Eastern Interconnection member's exit fee.[29]

Nor did FERC act arbitrarily and capriciously by instructing Tri-State to consider section 9 of the Basin contract when calculating the fee. In doing so, FERC pointed Tri-State to "the reasons stated in the concurrently issued" orders in *Northwest Rural Public Power District*. *Tri-State*, 191 FERC ¶ 61,088, at ¶ 64; *see also Tri-State*, 189 FERC ¶ 61,165, at ¶ 87. Those orders considered Tri-State's and Basin's section 9 obligations in detail. *See Nw. Rural Pub. Power Dist.*, 189 FERC ¶ 61,164, at ¶¶ 72–79; *Nw. Rural Pub. Power Dist.*, 191 FERC ¶ 61,087, at ¶¶ 25–31. And the appropriate place for Tri-State and Basin to challenge those findings isn't here—it's in the pending

---

[29] We also note that if, "in the future," the exit-fee methodology for Eastern Interconnection members "results in an unjust outcome, [Tri-State] may petition [FERC] to order appropriate changes at that time under section 206 of the Federal Power Act." *See Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 542 (D.C. Cir. 2010).

D.C. Circuit appeal of FERC's orders in the *Northwest Rural Public Power District* proceedings.[30]

With all this in mind, we conclude that FERC's handling of the Basin contract in the *Tri-State* proceedings was not arbitrary and capricious.

\*    \*    \*

FERC did not act arbitrarily and capriciously by (1) rejecting a lost-revenues approach for the exit-fee methodology, (2) adopting a balance-sheet approach for the exit-fee methodology, (3) adopting the transmission-crediting mechanism, or (4) applying the adopted balance-sheet approach to Eastern Interconnection members despite the Basin contract. Rather, when FERC made these decisions, it "engaged in reasoned decisionmaking." *Elec. Power Supply Ass'n*, 577 U.S. at 295. So FERC did not violate the APA.

## CONCLUSION

For these reasons, we deny the petitions for review.

---

[30] Similarly, Basin argues that FERC's reading of section 9 renders other parts of the Basin contract superfluous. But that argument challenges FERC's findings in the *Northwest Rural Public Power District* proceedings, not its findings in the proceedings on appeal here.

Nos. 24-9516, 24-9538, 25-9522, 25-9544, *Tri-State Generation and Transmission Association, Inc. v. Federal Energy Regulatory Commission*

**MCHUGH**, Circuit Judge, concurring in part and dissenting in part:

I agree with the well-reasoned majority opinion that FERC did not act arbitrarily and capriciously by (1) rejecting a lost-revenues approach, (2) adopting a balance-sheet approach, (3) applying transmission credits to a departing member's entire OATT invoice, or (4) applying the balance-sheet approach to Eastern Interconnection members. However, I depart from the majority with respect to the inclusion of non-networked debt in the transmission credit.

In the methodology proceedings, FERC cited to the D.C. Circuit's statement that the purpose of an exit charge is to "protect[ ] members of a cooperative against rate increases caused by the exit of a member, while also increasing membership commitment and stability" and to "cover[ ] the costs that a cooperative incurs to provide full requirements service to the member." *See Tri-State Generation & Transmission Ass'n*, 185 FERC ¶ 61,201, at ¶ 226 (2023) (brackets and quotation marks omitted) (quoting *United Power, Inc. v. FERC*, 49 F.4th 554, 561 (D.C. Cir. 2022)); *see also Tri-State Generation & Transmission Ass'n, Inc.*, 180 FERC ¶ 63,034, at ¶ 12 n.16 (2022). The entire analysis in adopting its balance-sheet approach was geared towards this purpose. FERC consistently focused on ensuring that the exit payment would compensate Tri-State for the costs incurred to serve the departing member and thereby preventing these costs from shifting to other members. *See Tri-State Generation & Transmission Ass'n*, 185 FERC ¶ 61,201, at ¶¶ 227, 234.

Of course, FERC balanced other concerns, such as not unreasonably deterring exit and ensuring that Tri-State did not over recover. *See id.* ¶¶ 57, 71, 75, 224, 564. But the entire proceeding focused on ensuring that Tri-State recovered its costs such that remaining members would not be burdened with the cost of investments made for the benefit of departing members.

The transmission-crediting system specifically focused on ensuring that Tri-State would (1) fully recover the departing member's share of transmission-related debts and obligations (2) without requiring members to pay twice for services through rates if they opted to continue using transmission services through the OATT. When FERC's Trial Staff proposed a transmission offset, it stated that this offset was needed for withdrawing members who continue to purchase transmission services "to avoid having the withdrawing Member pay again for that debt in future payments." *Tri-State Generation & Transmission Ass'n, Inc.*, 180 FERC ¶ 63,034, at ¶ 97. The ALJ determined that this proposal was just and reasonable. *Id.* ¶ 103. And she explicitly adopted Tri-State's proposed modification that an offset only be provided for "debt and debt-service related portions of future transmission-related payments." *Id.* ¶ 512 & n.920. FERC affirmed the ALJ's "inclusion and allocation of transmission-related debt." *Tri-State Generation & Transmission Ass'n*, 185 FERC ¶ 61,201, at ¶ 557. Although FERC changed the form of the offset to a crediting mechanism out of workability concerns, it never indicated an intent to change the ALJ's underlying allocation or rationale. *See id.* ¶¶ 557–66.

2

FERC first agreed that termination payments should include a pro-rata share of all Tri-State's transmission-related debt, reasoning that "Tri-State has built its transmission system to serve its members" and this approach "ensures that it will be able to recover those costs." *Id.* ¶ 558. But FERC rejected an upfront offset because it would be unworkable and likely inaccurate. *Id.* ¶ 559. FERC emphasized that accurately calculating any transmission offset was necessary to formulating a payment that was just and reasonable. *Id.* ¶ 560. Otherwise, the offset "would potentially create impermissible cost shifts . . . . because the transmission revenue offset is supposed to be recovered through the transmission rates Tri-State charges a withdrawing member." *Id.* If the offset were overestimated, "Tri-State w[ould] not recover the full offset amount from the withdrawing member, and the cost for the offset would shift onto other transmission customers." *Id.* However, FERC found the risk of underestimating the offset "[l]ess problematic" because "the costs would shift solely onto the withdrawing member." *Id.* ¶ 560 n.910.

In explaining its approach, FERC continued to concern itself with cost shifts to other members. It determined that its crediting mechanism was just, reasonable, and not unduly discriminatory or preferential because it would have "no effect on the rates of other Tri-State transmission customers," "does not disadvantage other OATT transmission customers," and does not "unduly favor the withdrawing member as it is only receiving credit and benefit for the amount it prepaid, which avoids a double recovery by Tri-State." *Id.* ¶ 565. In focusing primarily on avoiding cost shifts to other Tri-State members while also preventing double recovery—crediting only the

3

amount that a withdrawing member has prepaid—FERC affirmed its commitment to the ALJ's initial rationale despite changing the timing of the transmission offset.

Additionally, in response to complaints about the forfeiture rule not allowing a member to receive the full benefit of its payments, FERC in its Methodology Rehearing Order justified that rule by stating that, to prevent shifting costs of transmission-related debt to other members, "the withdrawing member must compensate Tri-State for this debt whether it uses Tri-State's system or not." *Tri-State Generation & Transmission Ass'n, Inc.*, 187 FERC ¶ 61,101, at ¶ 90 (2024). "The crediting mechanism is intended to ensure that, to the extent a withdrawn member continues to use and pay for Tri-State transmission, it receives credit for what it has already paid toward the recovery of Tri-State's costs." *Id.* But they "should not accumulate credit to the extent they are not using the assets for which they paid." *Id.* ¶ 92.

Crediting back the non-networked portion of a member's transmission-related debt payment is inconsistent with the above analysis. Including this debt in the transmission credit will naturally shift costs to other members for that member's share of non-networked transmission debt. Even if Tri-State were to fully recover this debt in member rates, rates would have to be increased to make up for the withdrawn member's share. Furthermore, FERC's inclusion of non-networked debt in the credit goes against the statement that a withdrawing member would not be unduly favored because the withdrawing member would receive more than the benefit it prepaid before using OATT services.

4

The majority opinion relies on certain quotes from the methodology orders to justify including non-networked debt in the transmission credit. The opinion first points to language in the Methodology Rehearing Order stating that the transmission crediting mechanism has additional purposes to (1) "ensur[e] that the debt-related costs of Tri-State's transmission assets are recovered through the [exit fee]" and (2) "ensur[e] that the withdrawing member reaps the full benefit of these costs incurred while minimizing cost shifts." *See Tri-State Generation & Transmission Ass'n, Inc.*, 187 FERC ¶ 61,101, at ¶ 90. Next the majority points to language from the Methodology Order stating that FERC consistently explained the transmission credit must return "the full time-value of the transmission-related debt portion of the [exit fee]." *See Tri-State Generation & Transmission Ass'n, Inc.*, 185 FERC ¶ 61,201, at ¶ 562.

To be sure, FERC consistently used phrases like "full benefit" and "full time-value" in the methodology orders. But the entire dispute on this issue is what FERC initially meant by those words. In context, I cannot read the methodology orders as intending to credit back more than departing members were at risk of being required to pay twice.

Starting with the Methodology Order, FERC makes much of its directive that Tri-State must "credit, over time, the full time-value of the transmission-related debt portion of the [exit fee]." *See id.* Indeed, FERC similarly relied on this language in the Second Compliance Order when it directed that separation of debt for networked and non-networked facilities failed to comply with the directive that Tri-State "credit,

5

over time, the *full* time-value of the transmission-related debt portion of the [exit fee]." *See Tri-State Generation & Transmission Ass'n, Inc.*, 189 FERC ¶ 61,165, at ¶¶ 36–37 (2024) (quoting *Tri-State Generation & Transmission Ass'n*, 185 FERC ¶ 61,201, at ¶ 562). However, in the Methodology Order, the phrase "full time-value" is followed by footnote 911, which defines full time-value as "[m]eaning the same interest rate used to calculate Commission-jurisdictional refunds under 18 C.F.R. § 35.19a (2022)." *Tri-State Generation & Transmission Ass'n*, 185 FERC ¶ 61,201, at ¶ 562 & n.911. The cited section of the Code of Federal Regulations directs how interest is to be calculated on FERC refunds. *See* 18 C.F.R. § 35.19a. Furthermore, in the accounting and finance context, "time-value" of money is defined as the "financial principle that . . . a sum of money is worth more now than in the future."[1]

Accordingly, looking at the entire context of the Methodology Order, it becomes clear that when FERC directed Tri-State to credit the "full time-value" of the transmission-related debt portion of the termination payment, it was directing that transmission credits must carry interest. FERC was not directing that Tri-State must credit back non-networked debt that Tri-State would then never recover.

Indeed, in the same paragraph of the Methodology Order, FERC states that "credit will be amortized in a straight line over the remaining term of depreciation rates for *transmission assets effective in Tri-State's OATT Formula Rate* at the time notice of withdrawal is given." *Tri-State Generation & Transmission Ass'n*, 185

---

[1] Catherine Cote, *Time Value of Money (TVM): A Primer*, Harvard Bus. Sch. Online (June 16, 2022), https://online.hbs.edu/blog/post/time-value-of-money.

FERC ¶ 61,201, at ¶ 562 (emphasis added). This language further suggests that credits would be calculated and allocated with reference to debt for facilities included in Tri-State's OATT rate, which does not include payments for non-networked facilities.

Turning to the second quote relied on by the majority, FERC stated in its Methodology Rehearing Order that its transmission crediting mechanism "strikes a reasonable balance between ensuring that the debt-related costs of Tri-State's transmission assets are recovered through the [exit fee], while also ensuring that the withdrawing member reaps the *full benefit* of these costs incurred while minimizing cost shifts." *Id.* ¶ 563 (emphasis added). But this language on striking a reasonable balance comes immediately after FERC's explanation of its decision to allow the transmission credit to apply to a withdrawn member's entire bill while also implementing a forfeiture rule for unused credits. *See id.* ¶¶ 562–63.

In context, the reasonable balance struck appears to be between allowing Tri-State to recover its full transmission debts from a withdrawing member while also allowing withdrawing members to receive the benefit they already prepaid. By "full benefit" the order seems to minimize the risk of credit forfeiture by applying that credit to the entire OATT invoice. The order does not explain why (or clearly indicate that) a withdrawing member should be credited back debt that it will not pay again under the original rationale.

The last point made in the majority opinion is that FERC in its Methodology Rehearing Order acknowledged concerns that member rates included charges for non-

networked facilities, but FERC rejected these concerns as relating to rates and therefore outside the scope of this proceeding. *See Tri-State Generation & Transmission Ass'n, Inc.*, 187 FERC ¶ 61,101, at ¶¶ 76, 95. That, of course, is correct. But while this demonstrates that FERC was aware member rates included charges for both networked and non-networked facilities, I am not persuaded it provides evidence that FERC intended departing members to recover more than necessary to prevent double recovery by Tri-State and double payment by departing members.

Indeed, if FERC had intended the transmission credit to include more than the amount needed to avoid double recovery by Tri-State and double payment by departing members, the decision as stated in the methodology orders might not survive arbitrary and capricious review.

FERC never explained how granting recovery of the entire transmission debt payment serves the purposes of an exit charge to "protect[ ] members of a cooperative against rate increases caused by the exit of a member, while also increasing membership commitment and stability," and to "cover the costs that a cooperative incurs to provide full requirements service to the member." *See United Power*, 49 F.4th at 561 (brackets and internal quotation marks omitted). Nor did FERC adequately address how crediting back non-networked debt would not create an undue risk of cost shifts. Thus, it is likely that if FERC intended to include non-networked debt in the credit, its decision would have "entirely failed to consider an important aspect of the problem," rendering it arbitrary and capricious. *See Motor*

8

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Accordingly, I believe that FERC changed its position and underlying rationale when it directed that the transmission credit must include amounts paid for both networked and non-networked facilities. Although FERC is permitted to change its mind, it did not acknowledge, much less explain, its decision to change course in the compliance proceedings. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasizing that an agency must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy"). Instead, in my view, FERC attempted to assert that crediting back non-networked transmission debt was always its intention and thereby engaged in impermissible post hoc rationalization to justify this directive.

Although I join the remainder of the majority opinion in full, I respectfully dissent with respect to the inclusion of non-networked debt in the transmission credit. I would grant the petition for review with respect to this limited point.

9